# Exhibit C
## (Part 2 of 2)

## EXHIBIT 2
## SHAREHOLDERS AGREEMENT
### between Equity Fund and Riječki list

## PARTIES

Riječki list, d.o.o., a limited liability company duly organized and validly existing under the laws of the Republic of Croatia, with its registered office at Zvonimirova 20a Street, Rijeka, Croatia, MBS 040149534 (hereinafter referred to as: "Riječki list")

and

**MEDIA DEVELOPMENT EQUITY FUND,** a limited liability company duly organized under the laws of the State of New York, USA, with its registered office at 45 West 21st Street, New York, NY 10010, United States of America, (hereinafter referred to as: the " Equity Fund")

(hereinafter sometimes collectively referred to as the "Parties")

in relation to **NOVI LIST d.d.** having its registered office at Zvonimirova 20a, Rijeka, Croatia, MBS 010000340 (hereinafter referred to as "Novi List" or the "Company")

## RECITALS

*Whereas,* the Company is purchasing a new printing press and upgrading its printing facility;

*Whereas,* to fund the purchase of the printing press, Novi List has entered into a Foreign Exchange Loan Facility and Guarantee Agreement dated August 19, 1999, with Raiffeisenbank Austria d.d., Soros Economic Development Fund ("SEDF"), Karlovački List d.o.o. and Adamić d.o.o. (the "RBA Agreement");

*Whereas,* for the benefit of Novi List, Media Development Loan Fund (the "MDLF"), owner of the Equity Fund, has guaranteed to SEDF that MDLF will reimburse to SEDF any funds it must pay pursuant to the guarantee provisions of the RBA Agreement;

*Whereas,* in order to consolidate the ownership of the Company, the management of Novi List has established Riječki list to collect shares in Novi List;

*Whereas,* in order to facilitate said consolidation of ownership, Riječki list is borrowing funds from MDLF for the purchase of shares in the Company;

*Whereas,* in order to fund the upgrading of the Company's printing facility and to further facilitate the consolidation of ownership in the Company, the Company is issuing new shares for purchase by the Equity Fund; and

*Whereas,* to effectuate the above, the Company, Riječki list, MDLF and the Equity Fund have entered into a Memorandum of Understanding (the "MoU"), attached hereto as Exhibit 1, and, in accordance therewith, are entering into a series of inter-locking agreements, namely a Credit Agreement between Riječki list and MDLF, a Share Subscription Agreement between the Company and the Equity Fund, an Option Agreement between the Company and the Equity Fund (the "Option Agreement"), and this Shareholders' Agreement (collectively, the "Agreements"); and

*Whereas,* the Company is a joint-stock company duly organized and existing under the laws of the Republic of Croatia, whose share capital will be HRK 12,543,000 (twelve million five hundred forty-three thousand Croatian kunas); and

29

*Whereas*, Riječki list is a registered holder and legal and beneficial owner of 18,139 (eighteen thousand one hundred thirty-nine) shares of the Company and shall be purchasing additional shares of the Company; and

*Whereas*, the Equity Fund has entered into the Share Subscription Agreement with the Company, dated October 28, 1999, for the purchase of eighteen thousand one hundred ninety (18,190) new shares of common stock of the Company, having a nominal value of HRK 300 (three hundred) each and the total nominal value of HRK 5,457,000 (five million four hundred fifty-seven thousand); and

*Whereas*, the Parties hereto consider it in their as well as in the Company's best interest to agree and make provisions in advance on certain matters relating to the management of the Company's affairs;

*THEREFORE*, in consideration of the premises above, the Parties have agreed as follows:

**TERMS AGREED**

1      **Conditions Precedent**

The coming into effect of this Agreement is conditional upon the following:

1.1      The Equity Fund shall have:

    (i)      completed, to its satisfaction, the financial and accounting and legal due diligence in respect of the Company;

    (ii)      completed, to its satisfaction, its examination of the Company's insurance cover;

    (iii)      completed, to its satisfaction, an environmental audit of the Company;

    (iv)      completed, to its satisfaction, an examination of Riječki list's Articles of Association;

    (v)      completed, to its satisfaction, its legal and financial due diligence examination of the provisions of the banking and financial agreements and arrangements to which the Company is a party, or by which its respective assets are bound; and

    (vi)      obtained the written approval of the Equity Fund's Board of Directors to enter into this Agreement.

1.2      Riječki list shall have obtained the written approval of its Management Board to enter into this Agreement.

1.3      The representations and warranties specified in Article 2 hereof shall each be true and correct in all material respects as of the date of this Agreement and, to the extent applicable, for as long as this Agreement is in force.

1.4      All the Agreements shall have been duly executed and none of the Agreements has terminated for any reason other than performance in full of any and all obligations by the parties thereto.

1.5      All the conditions precedent set forth in the Agreements shall have occurred.

2      **Representations and Warranties**

2.1      Riječki list's Representations and Warranties: As of the date hereof, Riječki list hereby warrants to the Equity Fund that, *inter alia*:

30

(i)     the information given to the Equity Fund with respect to the Company and Riječki list is accurate in all respects and complete;

(ii)    that the Balance Sheets, Income Statements and Cash Flow of the Company for 1996, 1997 and 1998 are accurate and complete;

(iii)   that the Company has no undisclosed or hidden liabilities, nor has Riječki list made future commitments which are material to the future financial results of the Company;

(iv)   that the Company and its subsidiaries has all the licenses, permits and authorities necessary to carry out its business;

(v)    that the balance sheet as of 30 June 1999, is not materially different than the one identified in Item (ii) above;

(vi)   that the Company has not materially increased its debt obligations since providing balance sheet information; and

(vii)  that the Company has met its results, projected in the Business Plan submitted to and approved by the Equity Fund on the date first above written (the "Business Plan"), for the first six months of 1999 in terms of sales and operating profits.

Riječki list hereby acknowledges that the Equity Fund is relying upon the accuracy of each of the Representations and Warranties in connection with entering into this Agreement.

2.2    The Equity Fund's Representations and Warranties: The Equity Fund hereby warrants that it is a limited liability company, duly organized under the laws of the state of its incorporation, and that the subscription and payment by the Equity Fund of the increase of the Company's registered share capital and the resultant acquisition by the Equity Fund of the shares of the Company, as well as the execution of this Agreement, have been approved by the Equity Fund's Board and requires no further approval.

**3      Corporate Governance**

3.1    For as long as the Equity Fund shall have at least 10 % (ten per cent) of the Company's registered share capital, the Equity Fund shall have the right to nominate one person to be appointed to the Company's Supervisory Board and shall have the right to remove the person so nominated and appointed.

3.2    The Parties agree to and shall procure and vote at the Shareholders' Meeting of the Company (the "Shareholder's Meeting") that any person from time to time so nominated by the Equity Fund, shall be duly appointed to the Supervisory Board.

3.3    The Parties agree to procure that the Supervisory Board of the Company shall consist of 5 (five) members. The Parties agree to procure that 4 (four) thereof, including the President, shall be nominated by Riječki list, and 1 (one) by the Equity Fund.

**4      Covenants**

4.1    Each of Riječki list and the Equity Fund, in their capacity as the Company's shareholders, shall procure that any member of the Supervisory Board of the Company appointed pursuant to the nomination by Riječki list and/or the Equity Fund shall act and vote in relation to the affairs of the Company so as to ensure that neither the Equity Fund, Riječki list nor the Company is in breach of any of the undertakings given by it in this Agreement, in any of the Agreements or in the RBA

Agreement, or in violation of the Articles of Association of the Company, attached hereto as Exhibit 2.

4.2    Following the completion of the open offer for shares of the Company to be made by Riječki list in accordance with the MoU, should any additional shares of the Company owned by parties other than Riječki list or the Equity Fund be made available for purchase, Riječki list and the Equity Fund shall act so that each purchases 50% of shares offered for sale. If one party declines to purchase all 50% of the shares available, the other party may freely purchase the remainder of the shares.

4.3.    Riječki list shall not sell, pledge, or otherwise transfer or hypothecate any shares of the Company that it presently holds or shall subsequently acquire until the earlier of (i) the Equity Fund having sold all of its shares in the Company, or (ii) two years after Novi List has fully exercised the option, but in any case no later than December 31, 2012, without the prior written consent of the Equity Fund.

4.4.    Any sale, pledge or other transfer or hypothecation of shares by the Equity Fund, other than pursuant to the Option Agreement, shall be subject to Riječki list's approval of the transferee; provided, however, that such approval shall not be unreasonably withheld. This right of approval shall automatically terminate upon the occurrence of any one of the following events:
(i)    termination or expiration of the Option Ageement;
(ii)    breach of this Agreement by Riječki list;
(iii)    breach of any of the Agreements; or
(iv)    default under the RBA Agreement.

5.    **Voting Powers**

5.1    The Parties agree that they shall meet at a preliminary meeting at least 15 days before the Shareholders' Meeting of the Company is to be convoked and discuss all the items to be brought before the Shareholders' Meeting (the "Preliminary Meeting"). Participation by means of a telephone conference or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time shall constitute presence in person for the purposes of the Preliminary Meeting.

5.2    The Parties shall try to come to an agreement upon all decisions to be brought before the Shareholders' Meeting (the "Preliminary Decision") with their best efforts and acting in good faith. The prime aim of the Parties shall be the benefit of the Company. The Preliminary Decision binds the representatives of the Parties at the Shareholders' Meeting who shall vote at the Shareholders' Meeting according to the Preliminary Decision.

5.3    Whenever a matter is submitted to the Preliminary Meeting and the Parties are unable to reach the Preliminary Decision on the matter by reason of disagreement between the Parties hereto, then a deadlock shall be deemed to have occurred in relation to that matter. If and whenever a deadlock is deemed to have occurred or in the event of persisting mutual disagreements between the Parties over the Company's policy and the failure to resolve them at a meeting of the Parties called for the purpose of finding an amicable solution to such disagreements, each Party shall be free to cast its votes at the Shareholders' Meeting as it may see fit.

5.4     The Parties hereby acknowledge that they intend to have equal number of votes in the Shareholders' Meeting. Should Riječki list come to hold more voting shares in the Company than the Equity Fund, Riječki list hereby accepts to grant the Equity Fund a proxy to vote whatever number of Riječki list's shares are necessary to achieve parity in the number of votes held by Riječki list and the Equity Fund.

5.5     Except as the Parties may otherwise agree in writing or save as otherwise provided or contemplated in this Agreement, the Parties shall exercise their powers in relation to the Company so as to ensure that:

(a)     the Company carries on and conducts its business and affairs in a proper and efficient manner and for its own benefit;

(b)     the Company transacts all its business on arm's length terms;

(c)     the Company shall not enter into any agreement or arrangement restricting its competitive freedom to provide and take goods and services by such means and from and to such persons as it may think fit;

(d)     the Company shall maintain with a well established and reputable insurer adequate insurance against all risks usually insured against by companies carrying on the same or a similar business and (without prejudice to the generality of the foregoing) for the full replacement or reinstatement value of all its assets of an insurable nature;

(e)     the Company shall not acquire, dispose of, hire, lease, license or receive licenses of any assets, goods, rights or services otherwise than at the best price reasonably obtainable in the circumstances;

(f)     the Company shall keep books of account and therein make true and complete entries of all its dealings and transactions of and in relation to its business;

(g)     the Company shall provide each Party with unaudited management accounts for each calendar quarter in a form acceptable to the Shareholders as soon as possible following their preparation;

(h)     the Company shall prepare such accounts in respect of each accounting reference period as are required by the Articles of Association and procure that such accounts are audited as soon as practicable and in any event not later than two months prior the Annual Shareholders' Meeting;

(i)     each accounting reference period of the Company shall be a period of 12 calendar months;

(j)     the Company shall keep each of the Parties fully informed as to all its financial and business affairs;

(k)     if the Company requires any approval, consent or license for the carrying on of its business in the places and in the manner in which it is from time to time carried on or proposed to be carried on, the Company will use its best endeavors to maintain the same in full force and effect;

(l)     the Company shall make changes and improvements to its accounting department, accounting practices and accounting system to the Equity Fund's satisfaction;

(m)     the Company shall not issue any new voting shares for as long as the Equity Fund remains a shareholder unless it shall have obtained the prior written consent of the Equity Fund;

(n)     the Company shall not enter into a transaction or a series of transactions in an amount in excess of DEM 500,000 other than transactions described in the Business Plan;

(o)     the Company shall not create or suffer to exist any debt, mortgage, pledge, lien, security interest or other charge or encumbrance, the value of which is DEM 500,000 or more, whether in one transaction or in a series of transactions, with respect to its assets;

(p)     the Company shall not enter into any management contract or similar arrangement whereby its business or operations are managed by any other person;

(q)     the Company shall not make changes, or permit changes to be made, to the nature of its present business;

(r)    the Company shall not merge or consolidate with any person or entity, or sell, assign, lease or otherwise transfer or dispose of, whether in one transaction or in a series of related transactions, all or a substantial portion of its assets; and

(s)    the Company shall not change its capital, including any increase or decrease in its share capital, redenomination, or splits of shares, or any action which might result in the dilution of the value of the shares.

5.4    The Parties hereto agree that the Equity Fund shall not interfere in the editorial policy of the Company, but it shall support and vote for any editorial decisions of Riječki list.

5.5    Each Party shall use all reasonable and proper means in its power to maintain, improve and extend the business of the Company and its subsidiaries and to further the reputation and interests of the Company and its subsidiaries

## 6    Confidentiality and Exclusivity

Unless otherwise required by law or legal injunction, the Parties shall preserve at all times strict confidentiality regarding the contents and the existence of this Agreement as well as regarding all strategic issues related to the Company.

## 7    Duration

7.1    The terms and conditions set forth in the Agreement shall remain in full force and effect for so long as the Parties continue to hold their shares of the Company. With exception of Section 6, the provisions of the Agreement shall cease to be applicable to such Party which has duly transferred all of its shares pursuant to the Agreement.

7.2    Notwithstanding the foregoing, the Equity Fund shall have the right at its option to terminate this Agreement upon the breach or termination of any of the Agreements or the Company's default under the RBA Agreement.

## 8    Successors and Assigns

This Agreement shall be personal to the Parties hereto and may not be assigned by any party without the prior written consent of the other Party, provided, however, that such consent shall not be unreasonably withheld. Prior to any assignment, the assignee shall agree in writing to be bound by the transferring Party's obligations under this Agreement.

## 9    Entire Agreement and Variation

This Agreement contains the entire agreement between the Parties relating to the subject matter of this Agreement and no variation of this Agreement shall be effective unless in writing and signed by or on behalf of each of the Parties.

## 10    Costs

The Parties agree to procure that the Company shall bear all legal, accountancy, financial advisor, consultant and other fees and costs incurred in the Republic of Croatia in connection with the preparation and negotiation of this Agreement. If the Parties fail to procure that the Company cover such cost, each Party shall bear it own costs in connection with the preparation and negotiation of this Agreement.

## 11    Notices

11.1    All notices which are required to be given in connection with this Agreement or with any arbitration under this Agreement, shall be in writing and shall be sent to the address of the



recipient set out in this Agreement or in any such other address as the recipient may designate by a given notice in accordance with the provisions of this Section. Any such notice may be delivered personally or by first class prepaid letter or facsimile transmission and shall be deemed to have been served if by personal delivery when delivered and if by first class post 48 hours after posting and if by facsimile transmission upon confirmation report.

11.2    All notices and other communications between the Parties shall be sent to the following addresses:

in the case of Riječki list:
Address: Zvonimirova 20a, 51000 Rijeka, Croatia
Attn: Zdenko Mance
Tel: (385 51) 65 00 12
Fax: (385 51) 65 00 32

in the case of the Equity Fund:
Media Development Equity Fund
Address: 45 West 21st Street, 4th floor, New York, NY 10010, USA
Attn: Harlan M. Mandel
Tel: 1 (212) 807 1304
Fax: 1 (212) 807 0540

## 12    Counterparts

This Agreement is entered into 3 (three) counterparts, each of which when signed shall be an original, but all counterparts shall together constitute one and the same document.

## 13    Severability

13.1    Notwithstanding that any provision of this Agreement may prove to be illegal or unenforceable, the remaining provisions of this Agreement shall continue in full force and effect.

13.2    If any of the provisions of this Agreement shall be declared or become null and void or be held invalid or unenforceable, such void, invalid or unenforceable provision, as the case may be, shall immediately be replaced by another provision to be agreed upon by the Parties, valid in form and substance and which shall in a legally correct manner accomplish as nearly as possible the purpose and intent of the void, invalid or unenforceable provision with regard to the interests of the Parties.

## 14    Governing Law and Settlement of Disputes

14.1    This Agreement shall be governed by and construed in accordance with the laws of the State of New York. The language of this Agreement shall be the English language.

14.2    Riječki list hereby (i) irrevocably submits to the non-exclusive jurisdiction of any New York State Court in the County of New York or United States District Court for the Southern District of New York (the "Federal Court") in any action or proceeding arising out of or relating to this Agreement, (ii) waives any objection or defense based on doctrines of venue or forum nonconvenience or similar rules or doctrines, and (iii) irrevocably agrees that all claims in respect of such an action or proceeding may be heard and determined in such New York State Court or Federal Court. Riječki list and the Equity Fund waive any right to trial by jury in any action, proceeding, or counterclaim arising out of or relating to this Agreement.

14.3.    Riječki list hereby irrevocably and unconditionally appoints National Corporate Research, Ltd. (the "New York Process Agent") with an office on the date hereof at 225 West 34th Street, New York, New York 10122, as its agent to receive on behalf of Riječki list and its property service of copies of the summons and complaint and any other process which may be served in any such action or proceeding in any such New York State Court or Federal Court and agrees promptly to

35

appoint a successor New York Process Agent in the County of New York, State of New York which successor Process Agent shall accept such appointment in writing prior to the termination for any reason of the appointment of initial New York Process Agent and that such Process Agents will accept the appointment in writing and consent to the terms hereof and Riječki list will deliver evidence of the foregoing to the Equity Fund together with the name and address of any successor Process Agent. In any such action or proceeding in such New York State Court or Federal Court, such service may be made on Riječki list by delivering a copy of such process to Riječki list in care of the appropriate Process Agent at such Process Agent's address (such service to be effective upon such receipt by the appropriate Process Agent). Riječki list hereby irrevocably and unconditionally authorizes and directs such Process Agent to accept such service on its behalf. As an alternate method of service, Riječki list irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding in such New York State or Federal Court by mailing of copies of such process to the Company, by certified or registered air mail at its address referred to in Section 11.2. Riječki list agrees that, to the fullest extent permitted by applicable law, a Final Judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the Judgment or in any other manner provided by law. Nothing herein shall affect the right of the Equity Fund to service of process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against Riječki list in any other jurisdiction.

14.4.  The Equity Fund may, in its sole discretion, as an alternative to litigation elect to arbitrate any claim or dispute arising out of or relating to this contract or the validity thereof against Riječki list in accordance with the commercial arbitration rules of the American Arbitration Association by a sole arbitrator. In the event that the lender elects arbitration, Riječki list hereby consents to submit the dispute to such arbitration. Riječki list may not elect arbitration without the consent of the Equity Fund and is bound by the Equity Fund's election as between litigation and arbitration. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. Section 1-16, and judgment upon the award rendered jurisdiction by the arbitrator may be entered by any court having jurisdiction thereof as limited herein. The place of arbitration shall be in the County of New York, State of New York. The language of arbitration shall be the English language. The arbitrator is empowered to award damages in excess of compensatory damages. Riječki list agrees that, to the fullest extent permitted by applicable law, a final award in any such arbitration shall be conclusive and may be enforced in other jurisdictions by suit on the award or in any other manner provided by law.

14.5   Nothing in this provision shall be deemed to (i) limit the applicability of any otherwise applicable statutes of limitation or repose and any waivers contained in this provision; or (ii) limit the right of the Equity Fund hereto (a) to exercise self help remedies such as (but not limited to) setoff, or (b) to foreclose against any real or personal property collateral, or (c) to obtain from a court provisional or ancillary remedies such as (but not limited to) injunctive relief, writ or possession or the appointment of a receiver. The Equity Fund may exercise such self help rights, foreclose upon such property, or obtain such provisional or ancillary remedies before, during or after the pendency of any arbitration proceeding brought pursuant to this Agreement. Neither this exercise of self help remedies nor the institution or maintenance of an action for foreclosure or provisional or ancillary remedies shall constitute a waiver of the right of any party, including the claimant in any such action, to arbitrate the merits of the controversy or claim occasioning resort to such remedies.

14.6.  If Riječki list has or hereafter may acquire any immunity, on the grounds of sovereignty or other similar grounds, from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, Riječki list hereby irrevocably waives such immunity in respect of its obligations under this Agreement.

Riječki list                                    Media Development Equity Fund

36

EXHIBIT 3
SHARE SUBSCRIPTION AGREEMENT
between Equity Fund and Novi List

This agreement (the "Agreement") is made by and between the following parties (the "Parties"):

**Novi List, d.d.**, a joint stock company formed under Croatian law, having its address at Zvonimirova 20a, Rijeka, Croatia, as represented by Zdenko Mance, Director (the "Company"); and

**Media Development Equity Fund, LLC**, a limited liability company duly registered under the laws of the State of New York, USA, having its address at 45 West 21st Street, New York, NY 10010, USA, as represented by Kenneth Anderson, Chairman (the "Equity Fund").

WHEREAS, the Company is purchasing a new printing press and upgrading its printing facility;

WHEREAS, in order to fund the upgrading of the Company's printing facility and to facilitate the consolidation of ownership in the Company, the Company wishes to issue new shares for purchase by the Equity Fund;

WHEREAS, the Equity Fund wishes to provide the Company financial assistance in achieving the goals described above;

WHEREAS, to effectuate the above purposes, the Company, the Equity Fund, Media Development Loan Fund ("MDLF") and Riječki list, d.o.o. ("Riječki list"), have entered into a Memorandum of Understanding dated October 28, 1999, a copy of which is attached hereto as Exhibit A (the "MoU"), and, in accordance therewith, a series of inter-locking agreements, namely this Agreement, an Option Agreement between the Equity Fund and Novi List, a Credit Agreement between MDLF and Riječki list, and a Shareholders' Agreement between Riječki list and the Equity Fund, all dated October 28, 1999 (collectively, including the MoU, the "Agreements");

NOW, THEREFORE, the Parties hereby agree as follows:

1.    **Purchase of New Shares.**    Subject to the terms and conditions of this Agreement and specifically upon the satisfaction of the conditions set forth in Section 2, the Equity Fund agrees to purchase and the Company agrees to issue and sell to the Equity Fund eighteen thousand one hundred ninety (18,190) new shares of common stock of the Company to be issued by the Company and to be approved by the General Meeting of Shareholders on December 15, 1999, a par value of which shall be three hundred (300) Croatian Kuna per share (the "New Shares"), which shall represent thirty percent (30%) of all outstanding voting shares of the Company, for an aggregate purchase price of one million eight hundred nineteen thousand (1,819,000) Deutsche Marks to be satisfied by payment by the Equity Fund to the Company's bank account.

37

2.      <u>Conditions Precedent to Closing</u>.  The obligation of the Equity Fund to subscribe the New Shares shall be subject to the fulfillment of the following conditions precedent on or prior to the Closing, it being understood that such conditions may be waived in writing in whole or in part by the Equity Fund at any time:

2.1.    The New Shares have been duly and validly authorized, issued and registered, and all other legal requirements in connection therewith have been duly satisfied;

2.2.    The sale of the New Shares to the Equity Fund by the Company shall have been duly authorized by all corporate action under its Charter;

2.3.    The representations and warranties specified in Section 6 hereof shall each be true and correct in all material respects as of the date of this Agreement and the Closing;

2.4.    The Charter of the Company shall be in full force and effect and in form and substance satisfactory to the Equity Fund, and the Company shall have obtained and/or maintained in force or renewed all governmental, corporate, shareholders' and other necessary licenses, approvals, consents, registrations or filings relating to: (i) the purchase of the New Shares by the Equity Fund, (ii) the carrying on of the business of the Company as it is presently carried on, (iii) the due execution and delivery of, and performance under, this Agreement, and (iv) the ability of the Company to remit to the Equity Fund, in convertible currency, all monies that are or may be payable in respect of the Equity Fund's New Shares, such as dividends, distributions in the event of the Company's liquidation, and proceeds from the sale of the Equity Fund's shares (including the amounts originally invested and any gains or distributions thereon);

2.5.    All the Agreements shall have been duly executed and none of the Agreements has terminated for any reason other than performance in full of any and all obligations by the parties thereto;

2.6.    All the conditions precedent set forth in the Agreements shall have occurred;

2.7.    The government or governmental authority has not taken any action for the dissolution or disestablishment of the Company or any action which would prevent the Company or its officers from carrying on its business or operations or substantial part thereof, nor any proceedings have been commenced against or by the Company seeking to declare the Company bankrupt or insolvent, or for the reorganization, administration, relief or liquidation of the Company under any applicable law, regulation, or requirement; and

2.8.    The management of the Company has not been replaced or new management appointed without prior written consent of the Equity Fund.

3. <u>Closing</u>. The Parties agree that, following the execution of this Agreement by the Parties and satisfaction of the Conditions Precedent, the Company shall transfer the New Shares to the Equity Fund. The New Shares shall be delivered free from any security interests, options, claims or other third party rights or encumbrances, including rights of preemption, of any nature whatsoever, together with all rights attached to them. The Company shall add the Equity Fund to the register of its shareholders, and deliver to the Equity Fund an excerpt from the register stating that the Equity Fund holds a valid title to the New Shares. If the Closing has not taken place by December 31, 1999, the Equity Fund shall have the right to terminate this Agreement.

4. <u>Payment</u>. The payment for the New Shares shall be effectuated by a single wire transfer to the Company's bank account within ten (10) days after the completion of all steps identified in Section 3 hereof.

5. <u>Redemption of New Shares at the Option of the Equity Fund</u>.

5.1. As long as the Equity Fund owns any New Shares and at any time after the occurrence of a Trigger Event as defined in Section 5.2 hereof, the Equity Fund at its option may cause that the Company redeem all of the New Shares held by the Equity Fund by the provision of notice to the Company (the "Redemption Notice"). The redemption price shall equal the purchase price increased by 15% per annum and shall be payable in US Dollars. The Company shall, within thirty (30) days of its receipt of the Redemption Notice, pay to the Equity Fund the redemption purchase price for the New Shares referred to in such notice. The Company agrees that it will unconditionally redeem the New Shares upon the exercise of the Equity Fund's option under the terms of this Section.

5.2. The Equity Fund shall be entitled to exercise its right pursuant to Section 5.1 at any time after the occurrence of one or more of the following events (the "Trigger Event"):

5.2.1. this Agreement is terminated, amended, modified or revoked, without the express prior written consent of the Equity Fund;

5.2.2. the Company fails to perform any of its obligations, or is in breach of any representation and warranty that it has made, under this Agreement or under the MoU;

5.2.3. if at any time, any government or governmental authority condemns, nationalizes, seizes or otherwise expropriates all or any substantial part of the property or other assets of the Company or of its share capital, or assumes custody or control of such property or other assets or the business or operations of the Company or of its share capital, or acquires majority ownership of the Company, or takes any action for the dissolution or disestablishment of the Company or any action which would prevent the Company or its officers from carrying on its business or operations or a substantial part thereof;

5.2.4. if any of the Agreements has terminated for any reason other than performance in full of any and all obligations by the parties thereto;

5.2.5. if any provision of any of the Agreements has been breached by any party thereto;

39

5.2.6.    if the Company has defaulted under the Foreign Exchange Loan Facility and Guarantee Agreement dated August 19, 1999, between the Company, Raiffeisenbank Austria d.d., Soros Economic Development Fund, Karlovački List d.o.o. and Adamić d.o.o.; or

5.2.7.    proceedings are commenced against or by the Company seeking to adjudicate the Company bankrupt or insolvent, or for the reorganization, administration, relief or liquidation of the Company under any applicable law, regulation or requirement.

5.3.    The exercise by the Equity Fund of the right under Section 5.1 shall not preclude the Equity Fund from exercising any of its other rights under this Agreement and shall not limit any other provision of this Agreement.

6.    Representations and Warranties of the Company.

6.1.  The Company represents and warrants to the Equity Fund as of the date of this Agreement:

6.1.1.    There are no options or other agreements outstanding which call for the transfer of the New Shares to any person or accord any person the right to call for or require the transfer of the New Shares. There are no options or other agreements outstanding which accord any person the right to call for or require the issue or the creation of any pledge, lien or other security or encumbrance over any of the New Shares.

6.1.2.    There is no power of attorney issued by the Company to any person authorizing that person to vote the New Shares on behalf of the Company.

6.1.3.    This Agreement has been duly and validly executed and delivered by the Company. This Agreement constitutes the valid and binding obligation of the Company, enforceable in accordance with its terms.

6.1.4.    The Financial Statements of the Company heretofore delivered constitute its Financial Statements and present fairly its financial position, assets and liabilities as of the date set forth therein.  Since the date of the most recent financial statements, there has been no material adverse change in the financial or other conditions of the Company.

6.1.5.    There is no fact which the Company has not disclosed in writing to the Equity Fund which materially adversely affects or, as far as the Company can now foresee, will materially adversely affect the properties, affairs, prospects, or condition (financial or otherwise) of the Company.

6.1.6.    There is no action, suit or proceeding pending against, or to the knowledge of the Company threatened against or affecting, the Company before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, financial position or results of operations of the Company or which in any manner draws into question the validity of this Agreement.

40

6.1.7.    All tax returns and other reports required by applicable law to be filed by the company have been filed, and all taxes, assessments and other governmental charges imposed upon the Company or any property of the Company and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof.

6.1.8.    The Company has good and marketable title to all of its properties and assets, free and clear of all liens, security interests and other charges and encumbrances and other types of preferential arrangements.

6.2.    The Equity Fund declares and the Company acknowledges that the Equity Fund relies solely on the matters represented and warranted in Section 6.1 and has entered into this Agreement on the basis of such representations and warranties.

7.    <u>Affirmative Covenants</u>.  As long as the Equity Fund will remain a shareholder of the Company and commencing from the date on which the Equity Fund becomes a shareholder, the Company shall, unless the Equity Fund shall otherwise agree:

7.1.    conduct its business (i) with due diligence and efficiency; (ii) in compliance with all applicable laws, regulations and orders of any governmental authority; (iii) in conformity with the general practice of independent, non-partisan, pluralistic, tolerant and responsible media; and (iv) in accordance with sound financial and accounting practices;

7.2.    obtain and maintain in force or, where appropriate, renew all governmental, corporate, shareholders' and other necessary licenses, approvals, consents, registrations and filings required for the purposes described in Section 2.4 hereof, and fully perform and observe all the conditions and restrictions contained in, or imposed on the Company by, such licenses, approvals or consents;

7.3.    make changes and improvements to its accounting department, accounting practices and accounting system to the Equity Fund's satisfaction;

7.4.    promptly inform the Equity Fund of (i) any proposed change in the nature or scope of the business or operations of the Company; and (ii) any event or condition, including, without limitation, any pending or threatened litigation, arbitration or administrative proceeding, which might have an adverse effect on the Company's business, operations or financial or other condition or the ability of the Company to perform any of its obligations under this Agreement;

7.5.    furnish promptly to the Equity Fund copies of all notices, reports and other communications of the Company to its shareholders and the minutes of all shareholders' meetings; without limiting the foregoing, the Company shall, on or before the date that it gives official notice to its shareholders of any shareholders' meeting, furnish the Equity Fund, by facsimile transmission, with notice of such meeting and the agenda thereof;

7.6.    maintain financial accounting records in accordance with accounting standards applicable in Croatia, and upon reasonable notice, at all reasonable times and as often as the Equity Fund may request, permit any authorized representative designated by the Equity

41

Fund to visit the Company and inspect the financial accounting records of the Company relating to this Agreement, and the financial condition of the company for the purpose of determining compliance with this Agreement, and permit any authorized representative designated by the Equity Fund to discuss the affairs, finances and condition of the Company with the Company's authorized financial officer or representative as the Equity Fund shall deem appropriate;

     7.7.    submit to the Equity Fund the following reports, accurate and complete:

        7.7.1.   monthly financial statements within 25 days after the end of each month for as long as the Equity Fund remains a shareholder of the Company, in the form determined by the Equity Fund,

        7.7.2.   annual financial statements of the Company audited and certified by an independent certified public accountant as fairly presenting the Company's financial position and results of its operation for such fiscal year, prepared in accordance with internationally accepted accounting standards, and

        7.7.3.   such additional financial and other information as the Equity Fund may reasonably request from time to time.

    8.    <u>Negative Covenants</u>.  As long as the Equity Fund will remain a shareholder of the Company, the Company shall not, unless the Equity Fund shall otherwise agree:

     8.1.    issue any voting shares;

     8.2.    enter into a transaction or a series of transactions in an amount in excess of DEM 500,000 other than transactions described in the Business Plan submitted to and approved by the Equity Fund on the date first above written (the "Business Plan");

     8.3.    create or suffer to exist any debt, mortgage, pledge, lien, security interest or other charge or encumbrance, the value of which is DEM 500,000 or more, whether in one transaction or in a series of transactions, with respect to its assets;

     8.4.    take any action which in any manner would be inconsistent with this Agreement, including but not limited to the making of changes, or permitting changes to be made, to the Company's Charter; provided that with respect to any proposed changes to the Charter, the decision by the Equity Fund as to whether or not to consent to such change shall not be unreasonably withheld;

     8.5.    enter into any management contract or similar arrangement whereby its business or operations are managed by any other person;

     8.6.    make changes, or permit changes to be made, to the nature of its present business;

     8.7.    merge or consolidate with any person or entity, or sell, assign, lease or otherwise transfer or dispose of, whether in one transaction or in a series of related transactions, all or a substantial portion of its assets; or

42

8.8.    change its capital, including any increase or decrease in its share capital, redenomination, or splits of shares, or any action which might result in the dilution of the value of the New Shares.

9.    Covenants Related to the Program-Related Investments. As long as the Equity Fund will remain a shareholder of the Company and commencing from the date in which the Equity Fund becomes a shareholder, the Company shall, unless the Equity Fund shall otherwise agree:

9.1.    use all the proceeds of the Equity Fund New Shares subscription solely for the purposes described in and permitted by the Business Plan;

9.2.    furnish to the Equity Fund, within 120 days after the end of each fiscal year of the Company, a full and complete narrative report, signed by the Director, describing the use of the proceeds of the Equity Fund New Shares subscription during the preceding fiscal year, and evaluating the progress of the Company toward achieving the goals of the Business Plan;

9.3.    maintain books and records adequate to enable independent certified public accountants to certify the financial statements, and retain such books and records and copies of the reports and statements referred to in Section 9.2 for a period of at least four years after the completion of the use of the proceeds of the Equity Fund New Shares subscription;

9.4.    not use any of the proceeds of the Equity Fund New Shares subscription to carry on propaganda, or otherwise attempt to influence legislation; and

9.5.    not use any of the proceeds of the Equity Fund New Shares subscription to participate in, or intervene in (including publishing or distributing of any statements), any political campaign on behalf of any political candidate for public office or attempt to influence the outcome of any specific public election, or to carry on, directly or indirectly, any voter registration drive.

10.    Sale of Shares by Equity Fund.  The sale of any of the Company's shares held by Equity Fund, shall be regulated by a separate option agreement by and between the Parties.

11.    Notices. Any notices, requests and other communications to any Party hereunder shall be in writing and shall be given to such Party at its address or facsimile number set forth herein or such other address or facsimile number as such Party may hereafter specify by a written notification to the other Party. Each such notice, request or other communication shall be effective (i) if given by facsimile transmission, when transmitted to the proper address and confirmed by telephone, (ii) if given by certified or registered air mail, when received or 72 hours after such communication is deposited in the mail, whichever is earlier, or (iii) if given by any other means, when delivered.

12.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the Republic of Croatia.

13.    Jurisdiction.  Any dispute, controversy or claim which may arise out of or in connection with this Agreement, or in the execution, breach, termination or invalidity thereof, shall be settled by a competent court in Croatia.

43

14.     Severability.  If any of the provisions of this Agreement are deemed invalid or unenforceable by an authority of competent jurisdiction, such provisions shall not apply but the remainder of the Agreement shall have full force and effect.


15.     Force and Effect of Language.  This Agreement is being executed in four Croatian copies, and each of the Parties shall have two copies.  Any version of this Agreement in the English language shall be for translation purposes only, and in case of any discrepancies between the English and Croatian versions, the Croatian version shall prevail.


IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives on the date first above written.

Signed for and on behalf of

Novi List, d.d., Rijeka, Croatia

Signed for and on behalf of

Media Development Equity Fund,

Equity Fund, New York, New York

44

**EXHIBIT 4**
**OPTION AGREEMENT**
between Equity Fund and Novi List

This agreement (the "Option Agreement") is made as of October ____, 1999, among the following parties (the "Parties"):

Novi List, d.d., a joint stock company formed under the laws of Croatia, having its address at Zvonimirova 20a, Rijeka, Croatia, as represented by Zdenko Mance, Director, acting under the Charter (the "Company" or "Novi List"); and

Media Development Equity Fund, LLC, a limited liability company registered under the laws of the State of New York, USA, having its address at 45 West 21st Street, New York, NY 10010, USA, as represented by Kenneth Anderson, Chairman, based on Certificate of Incorporation (the "Equity Fund").

**PREAMBLE**

WHEREAS, Novi List is purchasing a new printing press and upgrading its printing facility;

WHEREAS, to fund the purchase of the printing press, Novi List has entered into a Foreign Exchange Loan Facility and Guarantee Agreement dated August 19, 1999, with Raiffeisenbank Austria d.d., Soros Economic Development Fund ("SEDF"), Karlovački List d.o.o. and Adamić d.o.o. (the "RBA Agreement");

WHEREAS, for the benefit of Novi List, Media Development Loan Fund (the "MDLF"), the owner of the Equity Fund, has guaranteed to SEDF that MDLF will reimburse to SEDF any funds it must pay pursuant to the guarantee provisions of the RBA Agreement;

WHEREAS, in order to consolidate the ownership of Novi List, the management of Novi List has established a new company ("Riječki list") to collect shares in Novi List;

WHEREAS, in order to facilitate said consolidation of ownership, Riječki list is borrowing funds from MDLF for the purchase of Novi List shares;

WHEREAS, in order to fund the upgrading of Novi List's printing facility and to further facilitate the consolidation of ownership in Novi List, Novi List is issuing new shares for purchase by the Equity Fund; and

WHEREAS, to effectuate the above, Novi List, Riječki list, MDLF and the Equity Fund have entered into a Memorandum of Understanding and, in accordance therewith, are entering into a series of inter-locking agreements;

The Parties agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1.    Definitions.

"Agreements" means the MoU, the Share Subscription Agreement, the Credit Agreement and the Shareholders Agreement;

"Calculated Option Share Value" means the Original Purchase Price multiplied by the Multiplier;

45

"Credit Agreements" means the Credit Agreement between MDLF and Riječki list, dated October ___, 1999;

"Exercise Period" means the period (1) commencing on the later of (a) one year following the date on which the Interested Third Party as hereinafter defined completes full payment to MDLF of all sums due under the Credit Agreement or (b) the date on which the Company completes full payment of all sums due under the RBA Agreement, and (2) expiring on December 31, 2010;

"Exercise Price" means the Calculated Option Share Value, except that it shall mean (a) the Minimum Option Share Value if the Minimum Option Share Value is higher than the Calculated Option Share Value, or (b) the Maximum Option Share Value if the Maximum Option Share Value is lower than the Calculated Option Share Value;

"Interested Third Party" means Riječki list;

"LIBOR" means, for each one-year period commencing on September 15, the London interbank fixing rate for dollars as identified in the *Financial Times* column titled "World Interest Rates" on September 15 of each such one-year period ;

"Maximum Option Share Value" means the Original Purchase Price increased by 10% annually, compounded on an annual basis over the Valuation Period;

"Minimum Option Share Value" means the Original Purchase Price increased by LIBOR plus 2% annually over the Valuation Period;

"Market Value" means the fair market value per Option Share to be determined by the Parties using the Net Present Value method of valuation in a format to be reasonably agreed upon by the Parties, or, if they cannot agree within the time provided herein, then by arbitration in accordance with Article 8.2 hereof;

"MDLF" means Media Development Loan Fund;

"MoU" means the Memorandum of Understanding among the Company, the Equity Fund, MDLF and Riječki list, dated October ____, 1999, a copy of which is attached hereto as Exhibit A;

"Multiplier" means the percentage change in the Market Value of an Option Share between the beginning and the end of the Valuation Period;

"Non-Option Shares" means any Shares now or in the future held by the Equity Fund other than the Option Shares;

"Option" means the right, but not the obligation, to repurchase the Option Shares as set forth in Article 2 hereof;

"Option Shares" means 12,127 of the Shares purchased by the Equity Fund pursuant to the Share Subscription Agreement to which the Option to repurchase set forth in Article 2 hereof shall apply;

"Original Purchase Price" means the price paid per share by the Equity Fund under the Share Subscription Agreement;

"Repurchase Notice" has the meaning specified in Article 2.3 hereof;

"Share(s)" means one or more shares of common stock issued by Novi List;

"Shareholders Agreement" means the Shareholders Agreement between the Equity Fund and Riječki list, dated October ____, 1999;

"Share Subscription Agreement" means the Share Subscription Agreement between the Company and the Equity Fund, dated October ___, 1999; and

"Valuation Period" means the period from the date on which the Equity Fund makes payment for the Shares under the Share Subscription Agreement to the date on which the Parties execute the writing pursuant to Article 2.4.

1.2.     Conflict of Terms.  In case of conflicting interpretation of the terms contained herein and in any of the Agreements, the definitions set forth in Article 1.1 shall be controlling with respect to this Option Agreement.

## ARTICLE 2
## OPTION

2.1     Option to Repurchase Shares.  Provided that the Company has duly fulfilled all of its obligations under the terms and conditions of the Agreements, and subject to the terms and conditions of this Option Agreement, and specifically upon the satisfaction of the conditions precedent set forth in Article 3 hereof, the Company shall have the option to purchase the Option Shares from the Equity Fund at any time during the Exercise Period at the Exercise Price (the "Option").  The Company may purchase the Option Shares in whole or in part, in one or more tranches.

2.2.     Exercise Period.  The Exercise Period shall begin on the later of (a) one year from the date on which the Interested Third Party completes full payment to MDLF of all sums due under the Credit Agreements or (b) the date on which the Company completes full payment of all sums due under the RBA Agreement, and shall end on December 31, 2010, after which date the Option shall immediately expire.

2.3.     Exercise of Option.  For each tranche of Option Shares that the Company wishes to repurchase under Article 2.1, the Company must deliver to the Equity Fund written notice of its intent to exercise the Option (the "Repurchase Notice").  The Repurchase Notice shall identify the number of the Option Shares that the Company wishes to repurchase, shall bear the date on which the Repurchase Notice is being sent to the Equity Fund, and shall certify that the conditions precedent of Article 3 below have been fully satisfied as of that date.  Any Repurchase Notice received by the Equity Fund after December 31, 2010, shall be null and void.

2.4.     Determination of the Exercise Price.  The Parties shall determine the Exercise Price for a given tranche of Option Shares, using the methodology set out in Appendix 1 hereto, within 45 days after the receipt of the Repurchase Notice by the Equity Fund, and within that time both Parties shall execute a writing setting forth the Exercise Price.

2.5.     Payment of the Exercise Price.  Within ten banking days after the Parties execute a writing setting forth the Exercise Price for a given tranche of Option Shares, the Company shall transfer the amount due for the Option Shares, equal to the number of Option Shares being repurchased multiplied by the Exercise Price, to an account designated by the Equity Fund, exclusive of any taxes, levies, etc.  The Company shall pay all stamp duties, withholding or other similar taxes, as well as all other types of charges, which may be levied or assessed on the purchase and/or the remittance of payments to the Equity Fund.

2.6.     Transfer of Shares.  Upon the Equity Fund's receipt of payment for the Option Shares repurchased by the Company, the Equity Fund shall transfer those Option Shares to the Company free from all security interests, options, claims or other third party rights or encumbrances of any nature whatsoever, together with all rights attached to them.  The Company shall deliver to the Equity Fund an excerpt from the register showing that title to the repurchased Option Shares have been transferred from the Equity Fund to the Company.

2.7.    Market Value of Option Shares at Commencement of Valuation Period.  For the purpose of determination of the Multiplier, the Parties shall agree on the Market Value of the Option Shares at the commencement of the Valuation Period within 3 months of the payment for the Shares pursuant to the Share Subscription Agreement.

2.8.    Annual Notice of LIBOR. Until the Option can no longer be exercised, the Equity Fund will provide to the Company, no later than October 31 of each year, written notice of the value of LIBOR for that year for purposes of calculating the minimum Option Share Value.

2.9.    No Cash Premium.  The Parties acknowledge that no cash premium has been received by the Company, the Interested Third Party, the Equity Fund or MDLF in consideration for the Option.

## ARTICLE 3
## CONDITIONS PRECEDENT

3.    Conditions Precedent. The right of the Company to repurchase the Option Shares from the Equity Fund shall be subject to the fulfillment of the following conditions precedent on or prior to the date of any Repurchase Notice, it being understood that such conditions may be waived in writing in whole or in part by the Equity Fund at any time:

3.1.    The representations and warranties specified in Article 4 hereof shall each be true and correct in all material respects as of the date of this Option Agreement and the date of any Repurchase Notice.

3.2.    The Company shall have obtained and/or maintained in force or renewed all governmental, corporate, shareholders' and other necessary licenses, approvals, consents, registrations or filings relating to: (i) the purchase of the Option Shares, (ii) the carrying on of the business of the Company as it is presently carried on, (iii) the due execution and delivery of, and performance under, this Option Agreement, and (iv) the ability of the Company to remit to the Equity Fund, in convertible currency, all monies that are or may be payable in respect of the purchase of the Shares;

3.3.    All the Agreements shall have been duly executed and none of the Agreements has terminated for any reason other than performance in full of any and all obligations by the parties thereto.

3.4.    All the conditions precedent set forth in the Agreements shall have occurred.

3.5.    The Company and the Interested Third Party shall each have performed in full any and all of its respective obligations under the Agreements;

3.6.    The Company shall have fully repaid all sums due under the RBA Agreement; and

3.7.    The Interested Third Party shall have repaid in full all sums due MDLF under the Credit Agreements at least one year prior to the date of the first Repurchase Notice.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

4.1.    Representations and Warranties of Equity Fund.  The Equity Fund represents and warrants as follows:

4.1.1.    There are no options or other agreements outstanding which call for the transfer of the Option Shares to any person or accord any person the right to call for or require the transfer of the Option Shares. There are no options or other agreements outstanding which accord any person the right to call for or require the issue or the creation of any pledge, lien or other security or encumbrance over any of the Option Shares.

4.1.2. There is no power of attorney or proxy issued by the Equity Fund to any person, other than a *bona fide* representative of the Equity Fund, authorizing that person to vote the Option Shares.

4.1.3. This Agreement has been duly and validly executed and delivered by the Equity Fund. This Agreement constitutes the valid and binding obligation of the Equity Fund, enforceable in accordance with its terms.

4.2.    <u>Representations and Warranties of the Company</u>.  The Company represents and warrants as follows:

4.2.1. The financial statements of the Company heretofore delivered constitute its financial statements and present fairly its financial position, assets and liabilities as of the date set forth therein. Since the date of the most recent financial statements, there has been no material adverse change in the financial or other conditions of the Company.

4.2.2.    There is no fact which the Company has not disclosed in writing to the Equity Fund which materially adversely affects or, as far as the Company can now foresee, will materially adversely affect the properties, affairs, prospects, or condition (financial or otherwise) of the Company.

4.2.3.    There is no action, suit or proceeding pending against, or to the knowledge of the Company threatened against or affecting, the Company before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, financial position or results of operations of the Company or which in any manner draws into question the validity of this Agreement.

4.2.4.    All tax returns and other reports required by applicable law to be filed by the Company have been filed, and all taxes, assessments and other governmental charges imposed upon the Company or any property of the Company and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof.

4.2.5.    The Company is a joint stock company duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all corporate or other organization powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted. The Company has good and marketable title to all of its properties and assets, free and clear of all liens, security interests and other charges and encumbrances.

4.2.6.    This Agreement has been duly and validly executed and delivered by the Company. This Agreement constitutes the valid and binding obligation of the Company, enforceable in accordance with its terms.

## ARTICLE 5
### COVENANTS OF THE COMPANY

5.1.    <u>Affirmative Covenants</u>.  For as long as the Equity Fund is a shareholder of the Company, the Company shall, unless the Equity Fund shall otherwise agree:

5.1.1.    conduct its business (i) with due diligence and efficiency, (ii) in compliance with all applicable laws, regulations and orders of any governmental authority, (iii) in conformity with the general

practice of independent, non-partisan, pluralistic, tolerant and responsible media; and (iv) in accordance with sound financial and accounting practices;

    5.1.2.    obtain and maintain in force or, where appropriate, renew all governmental, corporate, shareholders' and other necessary licenses, approvals, consents, registrations and filings required for the purposes described in Article 2 hereof, and fully perform and observe all the conditions and restrictions contained in, or imposed on the Company by, such licenses, approvals or consents;

    5.1.3.    make changes and improvements to its accounting department, accounting practices and accounting system to the Equity Fund's satisfaction; and

    5.1.4.    give access to the Equity Fund's representative or agent to the Company's books and other financial records at all reasonable times.

5.2.    <u>Negative Covenants</u>.  For as long as this Option Agreement is in effect as defined in Article 8.8 hereof, the Company shall not do any of the following without the prior written approval of the Equity Fund and the Interested Third Party:

    5.2.1.    take any action which in any manner would be inconsistent with this Option Agreement, including but not limited to the making of changes, or permitting changes to be made, to the Company's Charter; provided that with respect to any proposed changes to the Charter, the decision by the Equity Fund as to whether or not to consent to such change shall not be unreasonably withheld;

    5.2.2.    make changes, or permit changes to be made, to the nature of its present business, or merge or consolidate with any person or entity, or sell, assign, lease or otherwise transfer or dispose of, whether in one transaction or in a series of related transactions, all or a substantial portion of its assets;

    5.2.3.    initiate any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, winding-up, liquidation or similar proceeding relating to the Company under the laws of any jurisdiction;

    5.2.4.    change its capital, including any increase or decrease in its share capital, redenomination, or splits of shares, or any action which might result in the dilution of the value of its shares;

    5.2.5    issue any additional shares;

    5.2.6.    enter into  a transaction or a series of transactions the value of which is in excess of 500,000 DEM, other than the transactions described in the Business Plan of the Company, submitted to and approved by the Equity Fund on the date first above written;

    5.2.7.    create or suffer to exist any debts, mortgage, pledge, liens, security interest or other charge or encumbrance, the value of which is DEM 500,000 or more, whether in one transaction or in a series of transactions;

    5.2.8.    enter into any management contract or similar arrangement whereby its business or operations are managed by any other person; or

    5.2.9.  exercise, or grant to any shareholder or third party the right to exercise, any pre-emptive right that would prevent, interfere with or in any way impair the sale, pledge or other transfer or hypothecation of the Option Shares or the Non-Option Shares by the Equity Fund acting in accordance with Article 6 hereof.

ARTICLE 6
COVENANTS OF THE EQUITY FUND

6.1.    Non-Option Shares. The Equity Fund shall not sell, pledge or otherwise transfer or hypothecate the Non-Option Shares to any party other than the Company or the Interested Third Party until after the earlier of (a) the Equity Fund's first receipt of a Repurchase Notice from the Company, (b) June 30, 2009, or (c) termination of this Option Agreement pursuant to Article 7 hereof. Thereafter, subject to Article 6.4 below, the Equity Fund shall have the right to sell, pledge or otherwise transfer or hypothecate the Non-Option Shares at any price to any party.

6.2.    Option Shares. The Equity Fund shall not sell any of the Option Shares other than to the Company, and shall hold the Option Shares clean of any pledge, lien or other security or encumbrance, until the earlier of (a) December 31, 2010 or (b) termination of this Option Agreement pursuant to Article 7 hereof. Thereafter, subject to Article 6.4 below, the Equity Fund shall have the right to sell, pledge or otherwise transfer or hypothecate the Option Shares at any price to any party.

6.3.    Exclusion from Pre-emptive Rights. Any sale, pledge or other transfer or hypothecation of Non-Option Shares or Option Shares by the Equity Fund in accordance with this Article shall not be subject to the exercise of any pre-emptive rights by the Company, other shareholders in the Company or any other parties, as set forth in Article 5.2.9.

6.4.    Right of Approval.    Any sale, pledge or other transfer or hypothecation of Non-Option Shares or Option Shares by the Equity Fund in accordance with this Article shall be subject to the Interested Third Party's approval of the transferee, which shall not be unreasonably withheld. Such right of approval shall not survive termination or expiration of this Option Agreement.

## ARTICLE 7
## TERMINATION

7.1.    Termination. This Option Agreement and the Option shall automatically terminate upon the occurrence of any one of the following:

or

      7.1.1.    Termination of any of the Agreements for any reason other than its performance in full;

      7.1.2.    Breach of any of the provisions of this Option Agreement by the Company; or

      7.1.3.    Breach of any of the provisions of any of the Agreements by the Company or by the Interested Third Party; or

      7.1.4.    Any default by the Company under the RBA Agreement.

7.2.    Breach of Credit Agreement. Without prejudice to any other right hereunder, the Company acknowledges that the breach of any of the provisions of the Credit Agreements by the Interested Third Party automatically terminates this Option Agreement and the Option. For the purposes of this Article 7.2, a copy of the notice of default by MDLF to the Interested Third Party shall constitute sufficient evidence of any such breach.

7.3.    Rights of Equity Fund upon Termination. In case of termination, the Equity Fund shall have the right to dispose of all of its shares in any way that it sees fit without restrictions of any nature whatsoever, and in particular without regard to any pre-emptive rights and without obtaining approval of the Interested Third Party under Article 6.4 hereof.

## ARTICLE 8
## MISCELLANEOUS

8.1.    Governing Law. This Option Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

51

8.2.     Consent to Jurisdiction; Arbitration; Waiver of Jury Trial; Etc.

8.2.1.     The Company hereby (i) irrevocably submits to the non-exclusive jurisdiction of any New York State Court in the County of New York or United States District Court for the Southern District of New York (the "Federal Court") in any action or proceeding arising out of or relating to this Option Agreement, (ii) waives any objection or defense based on doctrines of venue or forum nonconvenience or similar rules or doctrines, and (iii) irrevocably agrees that all claims in respect of such an action or proceeding may be heard and determined in such New York State Court or Federal Court.

8.2.2.     The Company and the Equity Fund waive any right to trial by jury in any action, proceeding, or counterclaim arising out of or relating to this Option Agreement.

8.2.3.     The Company hereby irrevocably and unconditionally appoints National Corporate Research, Ltd. (the "New York Process Agent") with an office on the date hereof at 225 West 34th Street, New York, New York 10122, as its agent to receive on behalf of the Company and its property service of copies of the summons and complaint and any other process which may be served in any such action or proceeding in any such New York State Court or Federal Court and agrees promptly to appoint a successor New York Process Agent in the County of New York, State of New York which successor Process Agent shall accept such appointment in writing prior to the termination for any reason of the appointment of initial New York Process Agent and that such Process Agents will accept the appointment in writing and consent to the terms hereof and the Company will deliver evidence of the foregoing to the Equity Fund together with the name and address of any successor Process Agent. In any such action or proceeding in such New York State Court or Federal Court, such service may be made on the Company by delivering a copy of such process to the Company in care of the appropriate Process Agent at such Process Agent's address (such service to be effective upon such receipt by the appropriate Process Agent). The Company hereby irrevocably and unconditionally authorizes and directs such Process Agent to accept such service on its behalf. As an alternate method of service, the Company irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding in such New York State or Federal Court by mailing of copies of such process to the Company, by certified or registered air mail at its address referred to in Article 8.7. The Company agrees that, to the fullest extent permitted by applicable law, a Final Judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the Judgment or in any other manner provided by law. Nothing herein shall affect the right of the Equity Fund to service of process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the Company in any other jurisdiction.

8.2.4.     The Equity Fund may, in its sole discretion, as an alternative to litigation elect to arbitrate any claim or dispute arising out of or relating to this contract or the validity thereof against the Company in accordance with the commercial arbitration rules of the American Arbitration Association by a sole arbitrator. In the event that the lender elects arbitration, the Company hereby consents to submit the dispute to such arbitration. The Company may not elect arbitration without the consent of the Equity Fund and is bound by the Equity Fund's election as between litigation and arbitration. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. Section 1-16, and judgment upon the award rendered jurisdiction by the arbitrator may be entered by any court having jurisdiction thereof as limited herein. The place of arbitration shall be in the County of New York, State of New York. The arbitrator is empowered to award damages in excess of compensatory damages. The Company agrees that, to the fullest extent permitted by applicable law, a final award in any such arbitration shall be conclusive and may be enforced in other jurisdictions by suit on the award or in any other manner provided by law.

8.2.5.     Nothing in this provision shall be deemed to (i) limit the applicability of any otherwise applicable statutes of limitation or repose and any waivers contained in this provision; or (ii) limit the right of the Equity Fund hereto (a) to exercise self help remedies such as (but not limited to) setoff, or (b) to foreclosure against any real or personal property collateral, or (c) to obtain from a court provisional or ancillary remedies such as (but not limited to) injunctive relief, writ or possession or the appointment of a receiver. The Equity Fund may exercise such self help rights, foreclose upon such property, or obtain such provisional or ancillary remedies before, during or after the pendency of any arbitration proceeding brought pursuant to this Option Agreement. Neither this exercise of self help remedies nor the institution or

maintenance of an action for foreclosure or provisional or ancillary remedies shall constitute a waiver of the right of any party, including the claimant in any such action, to arbitrate the merits of the controversy or claim occasioning resort to such remedies.

8.2.6.   If the Company has or hereafter may acquire any immunity, on the grounds of sovereignty or other similar grounds, from jurisdiction or any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, the Company hereby irrevocably waives such immunity in respect of its obligations under this Agreement.

8.3.   _Language_. This Option Agreement is being executed in four English original copies, and each of the Parties shall have two original copies.

8.4.   _Notices_.  All notices, requests and other communications to any Party hereunder shall be in writing and shall be given to such Party at its address or facsimile number set forth in Article 8.7hereof or such other address or facsimile number as such Party may hereafter specify for the purpose by notice to the other Party hereto. Each such notice, request or other communication shall be effective (i) if given by facsimile transmission, when transmitted to the proper address and confirmed by telephone, (ii) if given by certified or registered air mail, when received or 72 hours after such communication is deposited in the mails, whichever is earlier, or (iii) if given by any other means, when delivered; _provided_ that the Repurchase Notices to the Equity Fund under Article 2.3. shall not be effective until received.

8.5.   _Amendments and Waivers_.  Any provision of this Option Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Parties.

8.6.   _Successors and Assigns_.  This Option Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, except that the Company may not assign its rights hereunder or any interest herein without the prior written consent of the Equity Fund.

8.7.   _Prerequisites of the Parties_.
Media Development Equity Fund
45 West 21st Street, 4th floor
New York, NY 10010, USA
ph (1 212) 807 1304
fax (1 212) 807 0540
Attn: Harlan M. Mandel

Novi List
Zvonimirova 20a
Rijeka, zip, Croatia
ph (385 51) 65 00 12
fax (385 51) 65 00 32
Attn: Zdenko Mance, Director

8.8.   _Entry into Force; Effect_. This Option Agreement enters into force when duly executed by the Parties and shall remain in effect until the earlier of (a) the Equity Fund has sold all of its shares in the Company, or (b) two years after Novi List has fully exercised the option, but in any case no later than December 31, 2012.

IN WITNESS WHEREOF, the Parties have caused this Option Agreement to be executed by their duly authorized representatives on the date first above written.

Signed for and on behalf of
Novi List d.d., Rijeka, Croatia

Signed for and on behalf of
Media Development Equity Fund, LLC
New York, N.Y., U.S.A.