MORRISON & FOERSTER LLP
James E. Hough (JH 1066)
David S. Brown (DB 5276)
1290 Avenue of the Americas
New York, NY  10104-0050
212.468.8000
Attorneys for Plaintiff
Media Development Equity Fund LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                  :

Media Development Equity Fund, a New York         :
Limited Liability Company,                               :              **07 CV 3624 (PKL)**

                       Plaintiff,                :

                   -against-                 :

Novi List d.d., a joint stock company organized under :
the laws of the Republic of Croatia,                :

                     Defendant.            :
------------------------------------------------------------------ x

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................................ 1

II.  STATEMENT OF RELEVANT FACTS ............................................................... 3

    A.   Parties and Interested Non-parties............................................................... 3

    B.   MDLF's Financial Assistance To Novi List ............................................... 4

    C.   Breaches Resulting in Termination of the Option Agreement.............................. 7

        1.   Notice of Default................................................................................ 8

        2.   Failure to Deliver Proxy ..................................................................... 9

        3.   Failure to Furnish Written Notice of General Assembly
             Shareholders Meeting............................................................ 12

III. ARGUMENT .............................................................................................. 13

    A.   Legal Standard............................................................................................ 13

    B.   The Notice of Default Automatically Terminated the Option Agreement........... 14

    C.   Breach of the Voting Parity Obligation in the Shareholders' Agreement
         Terminated the Option Agreement............................................................... 17

    D.   Breach of the Written Notice Provision in the Shares Subscription
         Agreement Terminated the Option Agreement .................................... 20

IV.  CONCLUSION ........................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*Filner v. Shapiro*,
 633 F.2d 139 (2d Cir. 1980) .......................................................................................... 19

*Joseph Victori Wines, Inc. v. Vina Santa Carolina S. A.*,
 933 F. Supp. 347 (S.D.N.Y. 1996) .............................................................................. 14

*Kel Kim Corp. v. Central Markets, Inc.*,
 70 N.Y.2d 900 (N.Y. Ct. App. 1987) .......................................................................... 19

*Knight v. U.S. Fire Insurance Co.*,
 804 F.2d 9 (2d Cir. 1986) .............................................................................................. 14

*Marmer Bros. Constr., LLC v. Midwest Steel, Inc.*,
 2000 U.S. Dist. LEXIS 13381 (S.D.N.Y. Sept. 18, 2000) ...................................... 16, 19

*Miller v. Forge Mench Partnership, Ltd.*,
 2001 U.S. Dist. LEXIS 13046 (S.D.N.Y. Aug. 28, 2001) .................................. 16, 19-20

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
 2000 U.S. Dist. LEXIS 10066 (S.D.N.Y. 2000) .......................................................... 21

*Quarles v. General Motors Corp. (Motor Holdings Division)*,
 758 F.2d 839 (2d Cir. 1985) ...................................................................................... 14, 18

*S.E.C. v. Militano*,
 1994 U.S. Dist. LEXIS 8420 (S.D.N.Y. June 23, 1994) .......................................... 13-14

## STATUTES

26 C.F.R. 53.4944-3 ................................................................................................................ 7

26 C.F.R. 53.4945-6(c) .......................................................................................................... 6

Fed. R. Civ. P. 56(c) ............................................................................................................. 13

Plaintiff Media Development Equity Fund LLC ("MDEF") submits this memorandum of law in support of its motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  MDEF's motion seeks entry of judgment in its favor on Counts I, II and IV of its Amended Complaint.  Granting the motion on any of these Counts would dispose of the entire case, because each count in the Amended Complaint seeks identical relief.

## I.    PRELIMINARY STATEMENT

This is a declaratory judgment action in which MDEF seeks a declaration that an Option Agreement has been terminated based on four independent grounds.  Three of those grounds are at issue in this motion, and, as shown below, because no disputed material facts exist regarding those three grounds, MDEF is entitled to summary judgment declaring that the Option Agreement has been terminated.

First, MDEF's parent, Media Development Loan Fund ("MDLF") sent a Notice of Default in accordance with terms of a Credit Agreement between it and Rijecki List, a non-party described in more detail below.  The Credit Agreement evidenced a loan made by MDLF to Rijecki List to enable it to purchase shares in defendant Novi List d.d. ("Novi List").  The Option Agreement at issue here explicitly states that if MDLF were to send a Notice of Default under the Credit Agreement, the Option Agreement would automatically terminate.  The unilateral right to terminate the Option Agreement by sending a Notice of Default was an important term agreed to by the parties that provides critical protection for MDLF's charitable mission over the option exercise period, which runs though 2010 if not terminated earlier.  This right ensures that MDLF will not be required to make a significant charitable contribution (the option is worth between $3 to $5 million) to a media company that does not—in MDLF's sole judgment—meet certain key commitments concerning its internal corporate governance during this period.  At the same time, it ensures that MDLF will not be required to maintain investment of its charitable

assets in such a company, potentially for years.  Because there is no dispute that MDLF sent a Notice of Default, MDEF is entitled to a declaration that the Option Agreement was thereby unilaterally terminated.

Second, MDEF demanded a proxy from non-party Rijecki List in accordance with a Shareholders' Agreement between MDEF and Rijecki List that was intended to govern their relationship as the two largest shareholders in Novi List.  Rijecki List failed to deliver the proxy as required.  Under the explicit terms of the Option Agreement, any breach of the Shareholders' Agreement by Rijecki List results in automatic termination of the Option Agreement.  Because there is no dispute that (i) the Shareholders' Agreement requires the proxy as requested by MDEF, and (ii) the proxy was not delivered, the Shareholders' Agreement was breached, thereby entitling MDEF to a declaration that the Option Agreement was automatically terminated by that breach.

Third, MDEF was entitled to receive advance written notice from Novi List under the express terms of a Shares Subscription Agreement between MDEF and Novi List of any shareholder meeting and its agenda to permit MDEF the opportunity to influence shareholder meeting agendas.  Novi List failed to provide this written notice as required.  Under the explicit terms of the Option Agreement, any breach of any of the provisions of the Shares Subscription Agreement by Novi List results in automatic termination of the Option Agreement.  Because there is no dispute that (i) the Shares Subscription Agreement requires that Novi List provide MDEF with written notice of any shareholder meeting before it gives official notice to any shareholders, and (ii) this written notice was not provided, the Shares Subscription Agreement was breached, thereby entitling MDEF to a declaration that the Option Agreement was automatically terminated by that breach.

Each of the three grounds described above present an independent basis to support a declaration that the Option Agreement has been terminated, thereby resolving this case in its entirety.

## II.  STATEMENT OF RELEVANT FACTS

### A.  Parties and Interested Non-parties

Plaintiff MDEF, a New York LLC, is wholly owned by non-party MDLF, a public charity that provides low-cost financing to independent news media in emerging democracies.[1] Through low-cost capital, in-depth training and long-term advice and support, MDLF helps news outlets committed to responsible journalism strengthen their operations and become commercially sustainable.  MDEF is a special purpose vehicle, created by MDLF, to make its charitable program-related investment in defendant Novi List in the form of a significant equity investment.  MDEF is now the second largest shareholder in Novi List, and owns 30% of Novi List's stock.  All of the Novi List shares owned by MDEF are at issue in this action, because if the Option Agreement is declared to be terminated, as requested by MDEF, those shares can be sold at market prices without further delay, and the proceeds can be used by MDLF to further its charitable mission.

Defendant Novi List is the largest independent newspaper in Croatia, headquartered in Rijeka, the third largest city in Croatia.  It was a state-owned enterprise in the former Yugoslavia, and was privatized in the 1990's through a process that resulted in approximately 300 small shareholders owning the company.  In 1999, when the agreements at issue in this action were entered into, Novi List's independence was threatened by political forces, and its

---

[1] All of the facts set out in this section are supported by the Declaration of Harlan Mandel, dated August 10, 2007 (the "Mandel Decl.") submitted herewith.

commercial viability was hindered by a lack of access to affordable capital.  Novi List

approached MDLF for financial assistance to address its problems, and the financial package

described below was created.  Non-party Rijecki List is Novi List's largest shareholder, with

50.002% of Novi List's stock, which was largely purchased with funds borrowed from MDLF.

Rijecki List is comprised of members of Novi List's management and top journalists and was

created, through assistance from MDLF, for the purpose of stabilizing ownership in Novi List

and ensuring that Novi List could maintain its editorial independence with responsible

governance and sound management.

### B.  MDLF's Financial Assistance To Novi List

Starting in 1996, MDLF began to provide Novi List with critical financial assistance,

including two loans to Novi List that were repaid without incident.  In 1999, Novi List again

approached MDLF seeking financial assistance.  At the time, Croatia was ruled by Franjo

Tudjman, a former communist turned fierce nationalist.  Tudjman and his allies actively sought

to marginalize or control independent newspapers and television news shows that challenged his

leadership.  Because Novi List was one of the last remaining independent (and popular)

newspapers in Croatia, Tudjman and his allies watched it closely for takeover opportunities.

Novi List sought MDLF's financial assistance to ensure its continued independence.[2]

MDLF worked closely with Novi List's journalists and managers to create a financial

package that would address Novi List's needs for new capital and a more stable ownership

structure.  MDEF was formed as a vehicle to provide a capital infusion to Novi List, and to hold

30% of its shares.  Rijecki List was also formed, and largely funded with money borrowed from

---

[2] Novi List also needed MDLF funds to replace aging and outmoded equipment because loans from more conventional sources could have undermined Novi List's independence.  For example, banks approached by Novi List for financing required Novi List's shares as security for the loan, and Novi List feared, rightly, that collateralizing the shares could compromise editorial independence.

MDLF, so that the small shareholders who wished to sell their shares could do so without selling to Tudjman's cronies.

The financial package was more than merely a loan. Because even the most journalistically impressive media outlets can lack basic management knowledge and skills, which can considerably limit their chances of growth and survival, the parties agreed that Novi List and Rijecki List, respectively, would adhere to certain governance standards and normative guidelines, and that MDLF and MDEF would be permitted to determine whether those standards and guidelines were being met. For instance, MDLF and MDEF insisted on a number of affirmative covenants regarding Novi List's corporate governance,[3] including, Article V § 5.02 of the Credit Agreement—pursuant to which MDLF loaned Rijecki List money to purchase Novi List shares—which provides that Rijecki List shall "cause each of its subsidiaries [including Novi List] to comply, in all material respects with all laws and regulations applicable to the operation of [the] business . . . ." Article V § 5.03 imposes the same obligations on Rijecki List. (Exh. B, Article V (Credit Agreement).) Similarly, Article V § 5.1.1 of the Option Agreement requires that Novi List "conduct its business (i) with due diligence and efficiency, (ii) in compliance with all applicable laws, regulations and orders of any governmental authority, (iii) in conformity with the general practice of independent, non-partisan, pluralistic, tolerant and responsible media; and (iv) in accordance with sound financial and accounting practices. . . ." MDEF also reserved the right to one of five seats on the Supervisory Board of Novi List (which is equivalent to the board of directors of a US corporation) so long as MDEF owned at least 10% of the company. (Exh. C, Article III § 3.3 (Shareholders' Agreement).) Novi List was also

---

[3] *See*, *e.g.*, Exh. A, § 7 (Share Subscription Agreement, dated October 28, 1999), Exh. B, Article V (Credit Agreement, dated October 28, 1999), Exh. C, § 5 (Shareholders' Agreement, dated October 28, 1999), and Exh. D, Article V (Option Agreement, dated October 28, 1999).

required to substantially improve its accounting and internal controls so that it would be managed in accordance with the highest standards of corporate governance. (Exh. D, Article V § 5.1.3 (Option Agreement).)

The Option Agreement at issue in this case was an integral part of this financial package. Although MDEF purchased Novi List shares at a price based on a market-rate valuation, the Option Agreement permits Novi List to purchase two-thirds of MDEF's Novi List shares at below market prices provided certain conditions (such as those described above) are satisfied. Notably, MDEF's sale of shares to Novi List pursuant to the Option Agreement at below market price would be a charitable grant. (*See* 26 C.F.R. 53.4945-6(c).) The exercise period potentially runs through 2010. Because MDLF cannot sell the option shares while the Option Agreement remains in effect, the option period essentially requires MDLF to maintain investment of its charitable assets in Novi List. MDEF reserved the right under certain express circumstances to terminate the Option Agreement and thus any obligation by MDEF to make this charitable transfer of shares and to keep its funds tied up in an investment in Novi List. MDLF and MDEF also reserved the absolute discretion to determine whether such circumstances existed and, if so, to unilaterally declare defaults that would result in the termination of the Option Agreement.

The right to terminate the Option Agreement is of vital importance to MDEF. MDLF is required to exercise its judgment as a charitable institution to determine whether a news organization qualifies for its charitable assistance before approving a program-related investment or other charitable grant. (*See* 26 C.F.R. 53.4944-3).) The various contract terms permitting termination of the Option Agreement preserves MDLF's ability to exercise this same judgment as a charitable institution, thus ensuring that the charitable transfer of shares contemplated by the Option Agreement will not happen if MDLF deems Novi List unworthy of such a gift. It also

ensures that, under such circumstances, MDLF can divest from Novi List and use these assets to support deserving independent media companies.

Under the express terms of the Option Agreement, for instance, the Option Agreement automatically terminates upon a breach of any of the provisions of the Credit Agreement or any of the other aforementioned agreements. (Exh. D, Article VII (Option Agreement).) The Option Agreement also provided that, with regard to breaches of the Credit Agreement, notice of default by MDLF to Rijecki List would constitute sufficient evidence of any such breach. The Option Agreement, therefore, grants MDLF and MDEF the absolute discretion to determine whether Novi List is entitled to the contemplated charitable transfer of shares. (Exh. D, Article VII § 7.2 (Option Agreement).)

### C. Breaches Resulting in Termination of the Option Agreement

As detailed in the Amended Complaint, Novi List's former CEO, Zdenko Mance orchestrated a series of improper maneuvers designed to consolidate and maximize his influence over Novi List while marginalizing MDEF's role in Novi List's management.[4] Recent breaches include (i) following contentious Supervisory Board meetings on December 8, December 21, 2006 and January 5, 2007, Novi List's former CEO Zdenko Mance led the improper termination of Novi List's CEO Zoran Borcic, a highly effective manager whose continued stewardship of Novi List was widely supported by Novi List journalists;[5] (ii) at the January 5, 2007 meeting, without having performed any recruitment efforts, Mance proffered one candidate, Franjo Butorac, as successor CEO and the Supervisory Board of Novi List voted 3-2 in favor, despite

---

[4] See ¶¶ 31(a)-(w) of the Amended Complaint. Although Mance's motive in these acts is unclear, he has been the primary beneficiary of the improper conduct, and he would benefit even more if Novi List were permitted to purchase MDEF's shares at below market prices.

[5] Borcic has since sued Novi List in Croatia regarding his termination.

his clear lack of qualifications for the position (no supporting materials were provided to the Supervisory Board in support of his appointment, not even Butorac's resume or biographical information); (iii) during 2005 and 2006, Mance also received sizable salary payments from Novi List—the highest salary paid by the company—while holding no post and performing no job for Novi List other than his non-salaried position on its Supervisory Board; and (iv) in January 2007, Mance took a newly created position as "Advisor to the CEO" and through this "advisory role" assumed the powers of a CEO while retaining his position as Chair of the Supervisory Board, a practice disfavored by Croatian commentaries on corporate governance. Mance's salary as "Advisor" significantly exceeded that of the so-called CEO, Butorac.

Some of these breaches may involve disputed issues of fact. However, the three separate and independent grounds raised in this motion do not entail any disputed issue of fact, and resulted in automatic termination of the Option Agreement.

### 1. Notice of Default

On January 29, 2007 MDLF sent a Notice of Default to Rijecki List pursuant to the express terms of the Credit Agreement.[6] That same day, MDEF sent a notice of termination to Novi List, informing Novi List that the Option Agreement had been automatically terminated due to the issuance of a Notice of Default to Rijecki List.[7]

The Notice of Default specifies that Rijecki List failed to adhere to its obligations contained in Article V of the Credit Agreement regarding the governance of Novi List. The Notice of Default also specified that Novi List had failed to honor its obligations under Section 5.1 of the Option Agreement which requires Novi List, among other things, to conduct its

---

[6] (Exh. E (Notice of Default).)

[7] (Exh. F  (Notice of Termination).)

business in compliance with all applicable laws, and in conformity with the general practice of independent, non-partisan, pluralistic, tolerant and responsible media.

The Notice of Default required Rijecki List to repay the amounts outstanding under the Credit Agreement within 10 days. Rijecki List did not contest the Notice of Default nor the existence of the Events of Default described therein. Instead, on February 12, 2007, Rijecki List complied with the Notice of Default and paid in full the amounts due under the Credit Agreement.

### 2.  Failure to Deliver Proxy

To address the management crisis at Novi List, MDEF and other minority shareholders called for an extraordinary shareholders meeting to be held on May 11, 2007, and placed several critical issues on the agenda. On April 12, 2007, MDEF invoked its express right under the Shareholders' Agreement for a proxy to vote the number of shares required to achieve parity with the number of votes held by Rijecki List.[8]

Rijecki List refused, suggesting (through shifting justifications) that the proxy was somehow potentially impermissible under Croatian law, a conclusion that MDEF's Croatian counsel strongly disputes. By letter dated April 19, 2007, counsel for Rijecki List—the same attorney that represented Rijecki List in negotiating the Shareholders' Agreement with MDEF— while acknowledging Rijecki List's obligation to provide the proxy and voting parity to MDEF, now claimed that the proxy demanded was impermissible under Croatia law because voting rights could not be transferred without transfer of the shares themselves.[9] During a meeting in Rijeka on April 26, 2007, between MDEF and Rijecki List at which Rijecki List's counsel was

---

[8] (Exh. H  (H. Mandel Ltr. to Rijecki List, dated April 12, 2007).)

[9] (Exh. I (Rijecki List Ltr. to MDEF, dated April 19, 2007).)

present and MDEF's Croatian counsel joined by phone, Rijecki List's counsel argued that it is not possible for the proxy grantor and the proxy holder to appear at the same shareholders meeting and to vote differently and that any votes cast under these circumstances would be vulnerable to a claim of invalidity.  MDEF's Croatian counsel stated during this meeting that Rijecki List's positions with regard to the proxy are incorrect under Croatian law, and that the proxy can be validly issued under Croatian law.[10]

On May 11, 2007, the extraordinary shareholders meeting called by MDEF and other minority shareholders was held.  Rijecki List failed to provide the required proxy to MDEF. Rijecki List also failed to abstain from voting part of its shares, a simple method by which Rijecki List could have provided MDEF with voting parity if it wished to honor its commitment.

At the May 11 meeting, the shareholders voted on: (i) the appointment of Milos Oluic, a Mance nominee, to the Supervisory Board and (ii) an evaluation of the work of the Supervisory Board.[11]  Not surprisingly, without the proxy that Rijecki List wrongfully withheld, MDEF did not have sufficient votes to ensure its position on these critical issues would prevail.  As shown in the chart below, Rijecki List's failure to deliver a proxy decisively altered the result of the shareholder votes on two critical issues.[12]

---

[10] At the April 26 meeting, Rijecki List proposed a temporary transfer of shares as an alternative means to provide MDEF with voting parity, but when pressed conceded such a temporary transfer could not be effected in time for the May 11 meeting, because there was not adequate time to call a meeting of Rijecki List's shareholders to approve such a transfer.

[11] (Exh. G (Agenda of Extraordinary General Assembly Shareholders Meeting).)

[12] For each vote in the respective charts below, the first row represents actual votes cast, the second row represents a hypothetical vote had the proxy been issued (everything else held constant), and the third row represents a hypothetical vote had Rijecki List abstained from voting sufficient shares to give MDEF parity (everything else held constant).

**Vote to Nominate Milos Oluic to Supervisory Board**

| | For | Against | Abstained | Result |
|---|---|---|---|---|
| Actual Vote Without Proxy | 30, 411 | 19,942 | 332 | Mance Nominee Oluic Appointed Member of Supervisory Board |
| Hypothetical Vote With Proxy to MDEF to Vote 5,906 Rijecki List Shares | 24,505 | 25,848 | 332 | Mance Nominee Oluic <u>Not</u> Appointed Member of Supervisory Board |
| Hypothetical Vote if Rijecki List Had Abstained From Voting 11,812 Shares to Give MDEF Parity | 18,599 | 25,848 | 12,144 | Mance Nominee Oluic <u>Not</u> Appointed Member of Supervisory Board |

**Vote of Dissatisfaction with Work of Supervisory Board**

| | For | Against | Abstained | Result |
|---|---|---|---|---|
| Actual Vote Without Proxy | 19,837 | 30,516 | 332 | Vote of <u>No</u> Dissatisfaction with Work of Supervisory Board |
| Hypothetical Vote With Proxy to MDEF to Vote 5,906 Rijecki List Shares | 25,743 | 24,610 | 332 | Vote of Dissatisfaction with Work of Supervisory Board |
| Hypothetical Vote if Rijecki List Had Abstained From Voting 11,812 Shares to Give MDEF Parity | 25,743 | 18,703 | 12,144 | Vote of Dissatisfaction with Work of Supervisory Board |

Rijecki Lists wrongful failure to provide a proxy was repeated in July 2007.

On July 12, MDEF again invoked its express right under the Shareholders' Agreement for a proxy to vote the number of shares required to achieve parity with the number of votes held by Rijecki List, this time in connection with the general assembly shareholders meeting scheduled for August 3, 2007.[13]

---

[13] (Exh. J (MDEF Ltr. to Rijecki List, dated July 12, 2007).)

Rijecki List again refused to issue the proxy,[14] and failed to seek approval of a temporary transfer of shares—an alternative means of effecting voting parity that Rijecki List previously had proposed but declined to pursue based on purported timing issues.

### 3.  Failure to Furnish Written Notice of General Assembly Shareholders Meeting

On June 20, 2007, as required by law, the Official Gazette of Croatia published notice that Novi List's annual shareholder meeting would be held on August 3, 2007.  Under the express terms of the Shares Subscription Agreement, Novi List is required, "[a]s long as" MDEF is a shareholder, to furnish MDEF with written notice of any shareholder meeting including its agenda "on or before the date that it gives official notice to its shareholders."  Yet, Novi List failed to provide MDEF with written notice on or before June 20, and MDEF learned of the shareholder meeting from its counsel in Croatia who, on June 28, read the notice published in the Official Gazette.

By this time, the 10-day period to add new issues to the shareholder agenda had nearly passed, and MDEF was unable to place an important governance issue it had just learned of on the agenda.  Specifically, on June 19, 2007 MDEF learned during a Supervisory Board meeting that CEO Butorac had failed to follow express directions from the Supervisory Board regarding the sale of shares of Tisak, d.d., a publicly traded media company on the Zagreb Stock Exchange, in which Novi List owned a substantial share package.  An open offer to buy Tisak shares had been made by a certain buyer at a price well below the selling price on the Zagreb stock exchange.  Although Butorac had been instructed first to attempt to sell the Tisak shares— or as much of the shares held by Novi List as possible—for the higher prices available on the

---

[14] (Exh. K (Rijecki List Ltr. to MDEF, dated July 23, 2007).)

stock exchange, he instead sold all the shares pursuant to the open offer without first offering them on the stock exchange.  The price that Butorac received for the Tisak shares was the lowest price he was authorized to sell the shares for and was well below the stated selling price on the Zagreb Stock Exchange.  Based on the foregoing, MDEF planned to add to the agenda of the annual shareholders' meeting a vote on whether Butorac should be terminated due to insubordination and acts damaging to the company, among other important issues, but was prejudiced in its ability to do so by the failure to receive written notice as required by the Shares Subscription Agreement.

On July 30, for other reasons, Rijecki List agreed to adjourn the date of the August 3 general assembly shareholders meeting.[15]  That meeting has not yet been re-scheduled.

## III.    ARGUMENT

### A.  Legal Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  If the moving party meets its initial burden of showing the absence of any genuine issue of material fact, "[t]he opposing party may not solely rely on its pleadings, on conclusory factual allegations or on conjecture as to the facts that discovery might disclose.  Rather, the opposing party must present specific evidence supporting its contention that there is a genuine material issue of fact.  To show such a 'genuine dispute,' the opposing party must come forward with enough evidence to allow a reasonable jury to return a verdict in its favor."  *S.E.C. v. Militano*, 1994 U.S. Dist. LEXIS 8420, at *15 (S.D.N.Y. June 23, 1994)

---

[15] (Exh. L (Rijecki List Ltr. to MDEF, dated July 30, 2007).)

13

(internal citations omitted); *see also Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.

1986) (citing *Quarles v. General Motors Corp. (Motor Holdings Division),* 758 F.2d 839, 840

(2d Cir. 1985) (per curiam)) ("[A] party [may not] rely on mere speculation or conjecture as to

the true nature of facts to overcome a motion for summary judgment").

Fact disputes alone are not sufficient to defeat summary judgment.  Summary judgment

remains appropriate when fact disputes are not material to the grounds on which summary

judgment is sought.  *Quarles v. General Motors Corp. (Motors Holding Division),* 758 F.2d 839,

840 (2d Cir. 1985) (per curiam) ("[I]t must be remembered that the mere existence of factual

issues -- where those issues are not material to the claims before the court -- will not suffice to

defeat a motion for summary judgment").

**B.  The Notice of Default Automatically Terminated the Option Agreement**

Under New York law, "where the parties to a contract have agreed to a termination

clause, *it must be enforced as written*."  *Joseph Victori Wines, Inc. v. Vina Santa Carolina S. A*.,

933 F. Supp. 347, 352 (S.D.N.Y. 1996) (citing cases) (emphasis supplied).  Here, the parties

agreed to Section 7.2 of the Option Agreement which states that: (1) any breach by Rijecki List

under the Credit Agreement automatically terminates the Option Agreement, and (2) any Notice

of Default sent by MDLF constitutes sufficient evidence of the existence of such a breach to

trigger automatic termination of the Option Agreement:

> [Novi List] acknowledges that the breach of any of the provisions of the Credit
> Agreement by [Rijecki List] automatically terminates this Option Agreement and the
> Option.  *For the purposes of this [a]rticle . . . , a copy of the notice of default by MDLF
> to [Rijecki List] shall constitute sufficient evidence of any such breach.*[16]

---
[16] Section 7.2 of the Option Agreement (emphasis supplied).

14

Section 7.2 does not permit any dispute over whether or not a breach of the Credit Agreement has occurred to limit the automatic triggering effect of a Notice of Default issued by MDLF. This is a sensible approach agreed to by the parties. As stated above, the transfer shares by MDEF to Novi List at a below-market price pursuant to the Option Agreement would be a charitable grant. MDEF reserved the right under certain express circumstances to terminate the Option Agreement and any obligation by MDEF to make the charitable transfer of shares and maintain investment of its charitable assets in Novi List. MDEF also reserved for MDLF and MDEF the absolute discretion to determine whether such circumstances existed and, if so, to unilaterally declare defaults that would result in the termination of the Option Agreement. Just as MDLF is required to exercise its judgment as a charitable institution to determine whether a news organization qualifies for its charitable assistance before approving a program-related investment or other charitable grant, these terms of the Option Agreement preserve its ability to exercise this same judgment throughout its potentially long-term investment in, and association with, Novi List and prior to effecting the charitable transfer of shares contemplated by the Option Agreement.

MDLF's contractual right to effect a unilateral termination of the Option Agreement means that, even if there were a genuine dispute over the existence of an event of default, that dispute could not mire MDLF in endless litigation. MDLF's unilateral right to send a Notice of Default results in termination of the Option Agreement, thus preserving MDLF's control over its charitable giving.[17]

---

[17] Rijecki List could have, but did not, contest the existence of an event of default. Instead, it complied with the Notice of Default and paid the full amount due under the Credit Agreement.

Exclusive reliance on MDLF's judgment of whether a Credit Agreement breach has occurred was also sensible from Novi List's point of view. After all, MDLF was providing an exceptionally generous package of financial assistance and, in the Option Agreement, was offering to provide a further charitable gift (that is, by permitting Novi List to purchase a portion of MDEF's shares at a fraction of their value). When a generous offer is conditioned on the offeror's retention of certain unilateral rights, it is not unreasonable for the offeree to accept those conditions.

Fact disputes may exist over whether MDLF was correct that an Event of Default existed under the terms of the Credit Agreement. However, any such fact disputes are not material to the issues raised in this motion. The undisputed evidence shows that MDLF sent a Notice of Default to Rijecki List on January 29, 2007 and Rijecki List did not contest this Notice of Default. The undisputed evidence also shows that, under the express termination provision contained in Section 7.2 of the Option Agreement, the Notice of Default caused an automatic termination of the Option Agreement. These undisputed facts entitle MDEF to a declaration that the Option Agreement has been terminated, because the parties expressly agreed that the unilateral act of sending a Notice of Default would cause an automatic termination of the Option Agreement. *See Marmer Bros. Constr., LLC v. Midwest Steel, Inc.*, 2000 U.S. Dist. LEXIS 13381, at *12 (S.D.N.Y. Sept. 18, 2000) (granting summary judgment on unambiguous contract claim and stating that "[h]aving struck the bargain it did, [defendant] must now live with it."); *Miller v. Forge Mench Partnership, Ltd.*, 2001 U.S. Dist. LEXIS 13046, at *6 (S.D.N.Y. Aug. 28, 2001) (summary judgment granted where agreement was unambiguous).

### C.  Breach of the Voting Parity Obligation in the Shareholders' Agreement Terminated the Option Agreement

To ensure Novi List would be managed in accordance with the highest standards of good governance as appropriate for a newspaper dedicated to core values of independent journalism, MDEF and Rijecki List entered into a Shareholders' Agreement which, among other things, was intended to assure that Rijecki List would not have more voting power than MDEF even though it was likely to own more Novi List shares than MDEF:

> …Should Rijecki list come to hold more voting shares in [Novi List] than [MDEF], *Rijecki list hereby accepts to grant [MDEF] a proxy to vote whatever number of Rijecki list shares are necessary to achieve parity in the number of votes held by Rijecki list and [MDEF].*[18]

Rijecki List breached this obligation twice.  First, on March 12, 2007, MDEF and other minority shareholders called for an extraordinary shareholders meeting to permit a vote on several critical issues facing Novi List.  Because Rijecki List held more shares than MDEF at the time, on April 12, 2007, MDEF wrote to Rijecki List requesting a power of attorney granting MDEF a proxy to vote the number of shares required to achieve parity with the number of votes held by Rijecki List.  On April 19, and again on April 26, MDEF was told by Rijecki List that MDEF would not be provided with a proxy as required by the parties' agreement (in each instance offering different justifications for the denial), while acknowledging that MDEF had a right to the proxy.

On May 11, 2007, the shareholder meeting was held.  Rijecki List voted all of its shares, including on two critical issues noted above where MDEF took an opposing view.  Because Rijecki List's actions deprived MDEF of voting parity, MDEF's position on those two issues was in the minority.

---

[18] Section 5.4 of the Shareholders' Agreement. (emphasis supplied).

Second, on July 12, 2007, MDEF again wrote to Rijecki List requesting a power of attorney granting MDEF a proxy to vote the number of shares required to achieve parity with the number of votes held by Rijecki List at the general assembly shareholders meeting to be held on August 3, 2007.[19]  On July 23 MDEF was told by Rijecki List that MDEF would again not be provided with a proxy as required by the parties' agreement.[20]

There is no dispute that the Shareholders' Agreement requires the proxy requested by MDEF, and that the proxy was not delivered.  The failure to provide a proxy was a breach of the Shareholders' Agreement, and that breach automatically terminates the Option Agreement under Section 7.1.3 of the Option Agreement, which states, among other things, that breach of the Shareholders' Agreement automatically terminates the Option Agreement.  Summary judgment is, therefore, appropriate on this count.

The dispute regarding Rijecki List's shifting and, in MDEF's view, pretextual and wholly speculative, reasons for denying MDEF the proxy is not material to, and cannot defeat, MDEF's motion for summary judgment.[21]  *Quarles v. General Motors Corp. (Motors Holding Division),* 758 F.2d 839, 840 (2d Cir. 1985) ("[A] party [may not] rely on mere speculation or conjecture as to the true nature of facts to overcome a motion for summary judgment").  Moreover, even assuming for purposes of the present motion that a good faith dispute exists over the possible legal consequences of a vote at which the proxy is used by MDEF, that dispute would not excuse

---

[19] (Exh. J (MDEF Ltr. to Rijecki List, dated July 12, 2007).)

[20] (Exh. K (Rijecki List Ltr. to MDEF, dated July 23, 2007).)  The August 3 meeting was subsequently adjourned.  (Mandel Decl. at ¶ 39.)

[21] Those explanations revolved around Rijecki List's professed fear that a shareholder vote where MDEF voted some of Rijecki List's shares one way, but Rijecki List voted the remainder of its shares in a different way, would be subject to challenge under Croatian law.  (Exh. I (T. Dolicki Ltr. to H. Mandel, dated April 19, 2007); Mandel Decl. at ¶ 25.)  MDEF's Croatian counsel strongly disputes this interpretation of Croatian law.

18

Rijecki List from its obligation to provide the proxy. Under the terms of the Shareholders' Agreement, MDEF's right to the proxy is unconditional even if MDEF is not permitted, under Croatian law, to exercise it in a certain manner. *See Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 902 (N.Y. Ct. App. 1987) ("Impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible. Moreover, the *impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract*.") (emphasis added).

Furthermore, Rijecki List did more than simply refuse to deliver the proxy. Rijecki List also voted the full number of its shares against MDEF's position on two crucial disputed issues at the May 11, 2007 shareholders meeting. By voting the shares that should have been subject to the proxy, Rijecki List deprived MDEF of its contractual right to voting parity, and in doing so violated the spirit as well as the letter of the Shareholders' Agreement. *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir. 1980) ("In every contract there is an implied covenant of good faith and fair dealing which precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement.")

MDEF is entitled to a declaration that the Option Agreement is terminated and that MDEF is thereby relieved of any obligation to sell Novi List shares at below market prices and any other limitations on its right to sell Novi List shares contained therein. *Marmer Bros. Constr., LLC v. Midwest Steel, Inc.*, 2000 U.S. Dist. LEXIS 13381, at *12 (S.D.N.Y. Sept. 18, 2000) (granting summary judgment to plaintiff where defendant attempted to rely on extra-contractual provisions despite unambiguous contractual language); *Miller v. Forge Mench Partnership, Ltd.*, 2001 U.S. Dist. LEXIS 13046, at *6 (S.D.N.Y. Aug. 28, 2001) (granting

summary judgment to plaintiff where defendant breached unambiguous contract terms and dismissing counterclaims alleging that plaintiff unlawfully terminated the agreement).

### D. Breach of the Written Notice Provision in the Shares Subscription Agreement Terminated the Option Agreement

To ensure MDEF's active shareholder participation in the management of Novi List, Novi List and MDEF agreed in the Shares Subscription Agreement that MDEF would be given certain special shareholders rights. Included among these shareholder rights was that "[a]s long as" MDEF was a shareholder, Novi List "shall, on or before the date that it gives official notice to its shareholders of any shareholders' meeting, furnish" MDEF "with notice of such meeting and the agenda thereof" in writing.[22] The purpose of this notice provision was to allow MDEF the opportunity to shape the shareholder agenda before it was published to Novi List's general shareholders and without the burdens (*e.g.*, timing and costs) associated with formerly amending a shareholder agenda once published. On June 20, 2007, general shareholders received notice through the Official Gazette of Croatia that the General Assembly Shareholders' Meeting was to be held on August 3, 2007 before Novi List furnished MDEF with written notice of the meeting as required by the Shares Subscription Agreement. On June 28, MDEF's Croatian counsel read the notice published in the Official Gazette but by this time, the 10-day period to add new issues to the shareholder agenda had nearly passed and MDEF was unable to place items on the agenda that would challenge Butorac's acts of insubordination. Although Rijecki List eventually agreed to adjourn the August 3 general assembly shareholders meeting date, this adjournment does not excuse Rijecki List's initial failure to provide notice as required under the Shares Subscription Agreement.

---

[22] Section 7.5 of the Shares Subscription Agreement.

The undisputed evidence is that the Shares Subscription Agreement requires Novi List to provide MDEF with written notice of shareholder meetings on or before the date that notice is provided to its other shareholders. The undisputed evidence is that Novi List shareholders received notice of the General Assembly Shareholders' Meeting on June 20, 2007 and that Novi List failed to provide MDEF with written notice of this meeting on or before that date. The failure to provide this notice was a breach by Novi List of a provision of the Shares Subscription Agreement, regardless of whether the meeting itself was later adjourned for other reasons. The undisputed evidence also shows that, under the express termination provision contained in Section 7.1.3 of the Option Agreement, a breach of a provision of the Shares Subscription Agreement results in automatic termination of the Option Agreement. These undisputed facts entitle MDEF to a declaration that the Option Agreement has been terminated. *See Point Prods. A.G. v. Sony Music Entm't, Inc.*, 2000 U.S. Dist. LEXIS 10066, 15-16 (S.D.N.Y. 2000) (granting plaintiff's motion for summary judgment where contract required defendant to issue notice and defendant failed to issue notice).

## IV.    CONCLUSION

For the reasons set forth above, and in the accompanying Statement of Undisputed Material Facts, Plaintiff respectfully requests that the Court grant summary judgment in favor of MDEF on Counts I , II and IV of the Amended Complaint.

Dated: New York, NY           MORRISON & FOERSTER LLP
        August 10, 2007

                              By: _____
                                  James E. Hough (JH 1066)
                                  David S. Brown  (DB 5276)

                                  Attorneys for Plaintiff
                                  Media Development Equity Fund LLC
                                  1290 Avenue of the Americas
                                  New York, NY  10104-0050
                                  212.468.8000