MORRISON & FOERSTER LLP
James E. Hough (JH 1066)
David S. Brown (DB 5276)
1290 Avenue of the Americas
New York, NY  10104-0050
212.468.8000
Attorneys for Plaintiff
Media Development Equity Fund LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

| | |
|---|---|
| Media Development Equity Fund, a New York Limited Liability Company,<br><br>Plaintiff,<br><br>-against-<br><br>Novi List d.d., a joint stock company organized under the laws of the Republic of Croatia<br><br>Defendant. | **DECLARATION OF HARLAN MANDEL IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>07 CV 3624 (PKL) |

---------------------------------------------------------------- x

I, HARLAN MANDEL, declares as follows:

1. I am Deputy Chief Executive Officer of Plaintiff Media Development Equity Fund ("MDEF"), a New York LLC.  MDEF is wholly owned by non-party Media Development Loan Fund ("MDLF"), a New York-registered 501(c)(3) non-profit corporation with its principal place of business in New York.  MDEF is a special purpose vehicle used by MDLF to make its charitable program-related investment in Defendant Novi List.

2. I submit this declaration in support of MDEF's motion for partial summary judgment.  The facts in this declaration are based on my personal knowledge and the documents described herein.

3. Accompanying this Declaration is an Appendix of Exhibits that contains the documentary evidence submitted in support of this motion. The Exhibits are lettered and are referred to in this Declaration by Exhibit letter.

**A. Parties and Interested Non-Parties**

4. MDLF is a public charity that provides low-cost financing to independent news media in emerging democracies. Through low-cost capital, in-depth training and long-term advice and support, MDLF helps news outlets committed to responsible journalism strengthen their operations and become commercially sustainable. MDEF is a special purpose vehicle, created by MDLF, to make its charitable program-related investment in defendant Novi List in the form of a significant equity investment. MDEF is now the second largest shareholder in Novi List, and owns 30% of Novi List's stock.

5. Defendant Novi List is the largest independent newspaper in Croatia, headquartered in Rijeka, the third largest city in Croatia. It was a state-owned enterprise in the former Yugoslavia, and was privatized in the 1990's through a process that resulted in approximately 300 small shareholders owning the company. In 1999, when the agreements at issue in this action were entered into, Novi List's independence was threatened by political forces, and its commercial viability was hindered by a lack of access to affordable capital. Novi List approached MDLF for financial assistance to address its problems, and the financial package described below was created.

6. Non-party Rijecki List is Novi List's largest shareholder, with 50.002% Novi List's stock, which was largely purchased with funds borrowed from MDLF. Rijecki List is comprised of members of Novi List's management and top journalists and was created, through assistance from MDLF, for the purpose of stabilizing ownership in Novi List and ensuring that

Novi List could maintain its editorial independence with responsible governance and sound management.

### B. MDLF's Financial Assistance To Novi List

7. Starting in 1996, MDLF began to provide Novi List with critical financial assistance, including two loans to Novi List that were repaid without incident. In 1999, Novi List again approached MDLF seeking financial assistance. At the time, Croatia was ruled by Franjo Tudjman, a former communist turned nationalist. Tudjman and his allies actively sought to marginalize or control independent newspapers and television news shows that challenged his leadership. Because Novi List was one of the last remaining independent (and popular) newspapers in Croatia, Tudjman and his allies watched it closely for takeover opportunities. Novi List sought MDLF's financial assistance to ensure its continued independence.

8. Novi List also needed MDLF funds to replace aging and outmoded equipment. Banks approached by Novi List for financing required Novi List's shares as security for the loan, and Novi List feared that collateralizing the shares could compromise editorial independence.

9. MDLF worked closely with Novi List's journalists and managers to create a financial package that would address Novi List's needs for new capital and a more stable ownership structure. MDEF was formed as a vehicle to provide a capital infusion to Novi List, and to hold 30% of its shares. Rijecki List was also formed, and largely funded with money borrowed from MDLF, so that the small shareholders who wished to sell their shares could do so without selling to Tudjman's allies. The financial package included the following agreements that are pertinent to this motion for partial summary judgment.

10. Novi List issued 18,190 new shares, bringing the total number of issued Novi List shares to 60,000, and MDEF purchased all of these newly issued shares pursuant to a Shares Subscription Agreement, dated October 28, 1999 (the "Shares Subscription Agreement"). The

Shares Subscription Agreement required, among other things, that, "[a]s long as" MDEF remains a shareholder in Novi List, Novi List "shall, on or before the date that it gives official notice to its shareholders of any shareholders meeting, furnish" MDEF "with notice of such meeting and the agenda thereof" in writing. (*See* Shares Subscription Agreement, Section 7.5).) Attached at Exhibit A is a true and correct copy of the Shares Subscription Agreement.

11. Rijecki List was formed for the limited purpose of purchasing Novi List shares, both from the Novi List treasury, and from small shareholders. MDLF loaned Rijecki List money to fund those purchases, and the parties to that loan entered into a Credit Agreement, dated October 28, 1999 (the "Credit Agreement"). Attached at Exhibit B is a true and correct copy of the Credit Agreement.

12. Rijecki List and MDEF entered into a Shareholders' Agreement, dated October 28, 1999 (the "Shareholders' Agreement"). The Shareholders' Agreement requires Rijecki List to provide MDEF with a Proxy to ensure MDEF would always have equal voting rights at any Novi List shareholder meeting. (*See* Shareholders' Agreement, Section 5.4).) Attached at Exhibit C is a true and correct copy of the Shareholders' Agreement.

13. MDEF and Novi List also entered into an Option Agreement, dated October 28, 1999 (the "Option Agreement). Attached at Exhibit D is a true and correct copy of the Option Agreement.

14. Although MDEF purchased Novi List shares at a price based on a market-rate valuation, the Option Agreement permits Novi List to purchase two-thirds of MDEF's Novi List shares at below market prices provided certain conditions are satisfied. Notably, MDEF's sale of shares to Novi List pursuant to the Option Agreement at below market price would be a charitable grant. (*See* 26 C.F.R. 53.4945-6(c).) The exercise period potentially runs through

2010.  Because MDLF cannot sell the option shares while the Option Agreement remains in effect, the option period essentially requires MDLF to maintain investment of its charitable assets in Novi List.  MDEF reserved the right under certain express circumstances to terminate the Option Agreement and thus any obligation by MDEF to make this charitable transfer of shares and to keep its funds tied up in an investment in Novi List.  MDLF and MDEF also reserved the absolute discretion to determine whether such circumstances existed and, if so, to unilaterally declare defaults that would result in the termination of the Option Agreement.

15. MDLF is required to exercise its judgment as a charitable institution to determine whether a news organization qualifies for its charitable assistance before approving a program-related investment or other charitable grant.  (*See* 26 C.F.R. 53.4944-3).)  The various contract terms permitting termination of the Option Agreement preserves MDLF's ability to exercise this same judgment as a charitable institution, thus ensuring that the charitable transfer of shares contemplated by the Option Agreement will not happen if MDLF deems Novi List unworthy of such a gift.  It also ensures that, under such circumstances, MDLF can divest from Novi List and use these assets to support deserving independent media companies.

16. Under the express terms of the Option Agreement, for instance, the Option Agreement automatically terminates upon a breach of any of the provisions of the Credit Agreement or any of the other aforementioned agreements. (*See* Option Agreement, Article 7).)  The Option Agreement also provided that, with regard to breaches of the Credit Agreement, Notice of Default by MDLF to Rijecki List would constitute sufficient evidence of any such breach.  The Option Agreement, therefore, grants MDLF and MDEF the absolute discretion to determine whether Novi List is entitled to the contemplated charitable transfer of shares.  (*See* Option Agreement, § 7.2).)

17.     The unilateral right to terminate the Option Agreement by sending a Notice of Default was an important term agreed to by the parties that provides critical protection for MDLF's charitable mission over the option exercise period, which runs though 2010 if not terminated earlier.  This right ensures that MDLF will not be required to make a significant charitable contribution (the option is worth between $3 to $5 million) to a media company that does not—in MDLF's sole judgment—meet certain key commitments concerning its internal corporate governance during this period.  At the same time, it ensures that MDLF will not be required to maintain investment of its charitable assets in such a company, potentially for years.  Because there is no dispute that MDLF sent a Notice of Default, MDEF is entitled to a declaration that the Option Agreement was thereby unilaterally terminated.

18.     The financial package was more than merely a loan.  Because even the most journalistically impressive media outlets can lack basic management knowledge and skills, which can considerably limit their chances of growth and survival, the parties agreed that Novi List and Rijecki List, respectively, would adhere to certain governance standards and normative guidelines, and that MDLF and MDEF would be permitted to determine whether those standards and guidelines were being met.  For instance, MDLF and MDEF insisted on a number of affirmative covenants regarding Novi List's corporate governance, including, Article V § 5.02 of the Credit Agreement—pursuant to which MDLF loaned Rijecki List money to purchase Novi List shares—which provides that Rijecki List shall "cause each of its subsidiaries [including Novi List] to comply, in all material respects with all laws and regulations applicable to the operation of [the] business . . . ."  Article V § 5.03 imposes the same obligations on Rijecki List.  (*See* Credit Agreement, Article V).)  Similarly, Article V § 5.1.1 of the Option Agreement requires that Novi List "conduct its business (i) with due diligence and efficiency, (ii) in

compliance with all applicable laws, regulations and orders of any governmental authority, (iii) in conformity with the general practice of independent, non-partisan, pluralistic, tolerant and responsible media; and (iv) in accordance with sound financial and accounting practices. . . ."

19. Each of the aforementioned agreements contained certain affirmative covenants (the "Governance Covenants") that Novi List or Rijecki List, respectively, were obligated to abide by and which were designed to ensure sound corporate governance and MDEF's continued involvement in Novi List's affairs. (*See*, *e.g.*, Credit Agreement, Article V; Shareholders' Agreement, § 5; Option Agreement, Article V; and Shares Subscription Agreement, § 7).)

20. Novi List was also required to substantially improve its accounting and internal controls so that it would be managed in accordance with the highest standards of corporate governance. (*See* Option Agreement, § 5.1.3).)

21. MDEF also reserved the right to one of five seats on the Supervisory Board of Novi List (which is equivalent to the board of directors of a US corporation) so long as MDEF owned at least 10% of the company. (*See* Shareholders' Agreement, § 3.3).)

**C. Breaches Resulting in Termination of the Option Agreement**

22. Following contentious Supervisory Board meetings on December 8, December 21, 2006 and January 5, 2007, Novi List's former CEO Zdenko Mance orchestrated the improper termination of Novi List's CEO Zoran Borcic, a highly effective manager whose continued stewardship of Novi List was widely supported by Novi List journalists. Borcic has since sued Novi List in Croatia regarding his termination.

23. At the January 5, 2007 meeting, without having performed any recruitment efforts, Mance proffered one candidate, Franjo Butorac, as successor CEO and the Supervisory Board of Novi List 3-2 voted in favor, despite his clear lack of qualifications for the position. No

supporting materials were provided to the Supervisory Board in support of his appointment, not even Butorac's resume or biographical information.

24. During 2005 and 2006, Mance also received sizable salary payments from Novi List—the highest salary paid by the company—while holding no post and performing no job for Novi List other than his non-salaried position on its Supervisory Board.

25. In January 2007, Mance took a newly created position as "Advisor to the CEO" and through this "advisory role" assumed the powers of a CEO while retaining his position as Chair of the Supervisory Board. I am advised by Croatian counsel for MDEF that holding these dual roles is disfavored by Croatian commentaries on corporate governance. Mance's salary as "Advisor" significantly exceeded that of the so-called CEO, Butorac.

### 1. Notice of Default

26. On January 29, 2007 MDLF sent a Notice of Default to Rijecki List pursuant to the express terms of the Credit Agreement. The Notice of Default specifies that Rijecki List failed to adhere to its obligations contained in Article V of the Credit Agreement regarding the governance of Novi List. The Notice of Default also specified that Novi List had failed to honor its obligations under Section 5.1 of the Option Agreement which requires Novi List, among other things, to conduct its business in compliance with all applicable laws, and in conformity with the general practice of independent, non-partisan, pluralistic, tolerant and responsible media. That same day, MDEF sent a Notice of Termination to Novi List, informing Novi List that the Option Agreement had been automatically terminated due to the issuance of a Notice of Default to Rijecki List. Attached at Exhibits E and F are true and correct copies of the Notice of Default and Notice of Termination, respectively.

27. The Notice of Default required Rijecki List to repay the amounts outstanding under the Credit Agreement within 10 days. Rijecki List did not contest the Notice of Default

nor the existence of the Events of Default described therein. Instead, on February 12, 2007, Rijecki List complied with the Notice of Default and paid in full the amounts due under the Credit Agreement.

### 2. Failure to Deliver Proxy

28. MDEF and other minority shareholders called for an extraordinary shareholders meeting to be held on May 11, 2007, and placed several critical issues on the agenda. Attached at Exhibit G is a true and correct copy of the May 11, 2007 Agenda of Extraordinary General Assembly. On April 12, 2007, MDEF invoked its express right under the Shareholders' Agreement for a proxy to vote the number of shares required to achieve parity with the number of votes held by Rijecki List. Attached at Exhibit H is a true and correct copy of the April 12, 2007 MDEF letter to Rijecki List.

29. Rijecki List refused to issue the proxy. Rijecki List has offered different justifications for this refusal. By letter dated April 19, 2007, counsel for Rijecki List—the same attorney that represented Rijecki List in negotiating the Shareholders' Agreement with MDEF—while acknowledging Rijecki List's obligation to provide the proxy and voting parity to MDEF, now claimed that the proxy demanded was impermissible under Croatia law because voting rights could not be transferred without transfer of the shares themselves. Attached at Exhibit I is a true and correct copy of the April 19, 2007 Rijecki List letter to MDEF.

30. During a meeting in Rijeka on April 26, 2007, between MDEF and Rijecki List at which Rijecki List's counsel was present and MDEF's Croatian counsel joined by phone, Rijecki List's counsel argued that it is not possible for the proxy grantor and the proxy holder to appear at the same shareholders meeting and to vote differently and that any votes cast under these circumstances would be vulnerable to a claim of invalidity. I am advised that the positions taken

by Rijecki List with regard to the proxy are incorrect under Croatian law and that the proxy can be validly issued under Croatian law.

31.    At the April 26 meeting, Rijecki List proposed a temporary transfer of shares as an alternative means to provide MDEF with voting parity, but when pressed conceded such a temporary transfer could not be effected in time for the May 11 General Assembly, because there was not adequate time to call a meeting of Rijecki List's shareholders to approve such a transfer.

32.    On May 11, 2007, the extraordinary shareholders meeting called by MDEF and other minority shareholders was held. Rijecki List failed to provide the required proxy to MDEF. Rijecki List also failed to abstain from voting part of its shares, a simple method by which Rijecki List could have provided MDEF with voting parity if it wished to honor its commitment.

33.    At the May 11 meeting, the shareholders voted on: (i) the appointment of Milos Oluic, a Mance nominee, to the Supervisory Board and (ii) an evaluation of the work of the Supervisory Board. Not surprisingly, without the proxy that Rijecki List wrongfully withheld, MDEF did not have sufficient votes to ensure its position on these critical issues would prevail. As shown in the chart below, Rijecki List's failure to deliver a proxy decisively altered the result of the shareholder votes on two critical issues. For each vote in the respective charts below, the first row represents actual votes cast, the second row represents a hypothetical vote had the proxy been issued (everything else held constant), and the third row represents a hypothetical vote had Rijecki List abstained from voting sufficient shares to give MDEF parity (everything else held constant).

### Vote to Nominate Milos Oluic to Supervisory Board

|  | For | Against | Abstained | Result |
|---|---|---|---|---|
| Actual Vote Without Proxy | 30,411 | 19,942 | 332 | Mance Nominee Oluic Appointed Member of Supervisory Board |
| Hypothetical Vote With Proxy to MDEF to Vote 5,906 Rijecki List Shares | 24,505 | 25,848 | 332 | Mance Nominee Oluic Not Appointed Member of Supervisory Board |
| Hypothetical Vote if Rijecki List Had Abstained From Voting 11,812 Shares to Give MDEF Parity | 18,599 | 25,848 | 12,144 | Mance Nominee Oluic Not Appointed Member of Supervisory Board |

### Vote of Dissatisfaction with Work of Supervisory Board

|  | For | Against | Abstained | Result |
|---|---|---|---|---|
| Actual Vote Without Proxy | 19,837 | 30,516 | 332 | Vote of No Dissatisfaction with Work of Supervisory Board |
| Hypothetical Vote With Proxy to MDEF to Vote 5,906 Rijecki List Shares | 25,743 | 24,610 | 332 | Vote of Dissatisfaction with Work of Supervisory Board |
| Hypothetical Vote if Rijecki List Had Abstained From Voting 11,812 Shares to Give MDEF Parity | 25,743 | 18,703 | 12,144 | Vote of Dissatisfaction with Work of Supervisory Board |

34. Rijecki Lists wrongful failure to provide a proxy was repeated in July 2007.

35. On July 12, MDEF again invoked its express right under the Shareholders' Agreement for a proxy to vote the number of shares required to achieve parity with the number of votes held by Rijecki List, this time in connection with the general assembly shareholders meeting scheduled for August 3, 2007. Attached at Exhibit J is a true and correct copy of the July 12, 2007 MDEF letter to Rijecki List.

36. Rijecki List again refused to issue the proxy, and failed to seek approval of a temporary transfer of shares—an alternative means of effecting voting parity that Rijecki List previously had proposed but declined to pursue based on purported timing issues. Attached at Exhibit K is a true and correct copy of the July 23, 2007 Rijecki List letter to MDEF.

### 3. Failure to Furnish Written Notice of General Assembly Shareholder Meeting

37. On June 20, 2007, as required by law, the Official Gazette of Croatia published notice that Novi List's annual shareholder meeting would be held on August 3, 2007. Under the express terms of the Shares Subscription Agreement, Novi List is required, "[a]s long as" MDEF is a shareholder, to furnish MDEF with written notice of any shareholder meeting including its agenda "on or before the date that it gives official notice to its shareholders." Yet, Novi List failed to provide MDEF with written notice on or before June 20, and MDEF learned of the shareholder meeting from its counsel in Croatia who, on June 28, read the notice published in the Official Gazette.

38. By this time, the 10-day period to add new issues to the shareholder agenda had nearly passed, and MDEF was unable to place an important governance issue it had just learned of on the agenda. Specifically, on June 19, 2007 MDEF learned during a Supervisory Board meeting that CEO Butorac had failed to follow express directions from the Supervisory Board regarding the sale of shares of Tisak, d.d., a publicly traded media company on the Zagreb Stock Exchange, in which Novi List owned a substantial share package. An open offer to buy Tisak shares had been made by a certain buyer at a price well below the selling price on the Zagreb stock exchange. Although Butorac had been instructed first to attempt to sell the Tisak shares—or as much of the shares held by Novi List as possible—for the higher prices available on the stock exchange, he instead sold all the shares pursuant to the open offer without first offering

them on the stock exchange. The price that Butorac received for the Tisak shares was the lowest price he was authorized to sell the shares for and was well below the stated selling price on the Zagreb Stock Exchange. Based on the foregoing, MDEF planned to add to the agenda of the annual shareholders' meeting a vote on whether Butorac should be terminated due to insubordination and acts damaging to the company, among other important issues, but was prejudiced in its ability to do so by the failure to receive written notice as required by the Shares Subscription Agreement.

39.  On July 30, for other reasons, Rijecki List agreed to adjourn the date of the August 3 general assembly shareholders meeting. That meeting has not yet been re-scheduled. Attached at Exhibit L is a true and correct copy of the July 30, 2007 Rijecki List letter to MDEF.

I declare under penalty of perjury that the foregoing is true and correct.
Executed August 10, 2007.

_____
Harlan Mandel

ny-762164